L. F. Pace & Sons, Inc. *v.* The Travelers
Indemnity Company
(3491)

Dupont, C. J., Borden and Bieluch, Js.

Argued March 20—decision released September 2, 1986

*Peter D. Clark,* for the appellant-appellee (defendant).

*Vincent M. Simko,* with whom, on the brief, was *Keith A. Rubenstein,* for the appellee-appellant (plaintiff).

BIELUCH, J. The defendant appeals, and the plaintiff cross appeals, from the judgment of the trial court after a jury verdict for the plaintiff in this action for the bad faith breach of an implied contract to act as surety on construction performance and payment bonds. The jury returned a verdict for the plaintiff in

the total amount of $340,843 for compensatory and punitive damages. The defendant claims, in its groupings of issues, that the trial court erred: (1) in denying the defendant's motion to set aside the jury verdict; (2) in denying the defendant's motion for judgment notwithstanding the verdict; and (3) in instructing the jury with respect to promissory estoppel. The plaintiff's cross appeal claims error in the trial court's denial of his postverdict motion for interest on the jury's awards for compensatory and punitive damages. We find no error.

The jury could reasonably have found the following facts. The plaintiff corporation was a general contractor engaged almost exclusively in public construction. The defendant is a specially chartered insurance corporation licensed to do business as a surety company. On December 14, 1973, the parties entered into a General Agreement of Indemnity "whereby the plaintiff agreed to indemnify and save the defendant harmless from and against every claim, cost, judgment and expense caused to the defendant as a consequence of issuing surety bonds for and on behalf of the plaintiff."[1] Thereafter, the defendant issued bid bonds, as well as payment and performance bonds,[2] on application of the plaintiff in connection with various public construction

---

[1] For a general discussion on the indemnification of a surety see 11A Appleman, Insurance Law and Practice §§ 6661 through 6667.

[2] In its instructions to the jury, the trial court defined the terms "bid bond," "performance bond" and "payment bond" as follows: "A 'bid bond' is a promise by the contractor, which is guaranteed by a surety company, to indemnify the owner against loss resulting from the refusal of the contractor, upon awarding of the contract, to enter into the contract and furnish performance and payment bonds. A 'performance bond' is a promise by a contractor, which is guaranteed by a surety company, that the contractor will perform the contract. A 'payment bond' is a promise by a contractor, which is guaranteed by a surety company, that the said contractors and material men who supply services and material for the construction of the project, will be paid by the contractor." There was no dispute at trial as to the definitions of these terms.

projects. These bonds were issued through Vincent J. Fazio, an authorized attorney-in-fact of the defendant. Fazio was associated with the Vin Agency, Inc., an insurance agency located in Bridgeport.

After May, 1974, the defendant became concerned about the plaintiff's financial condition. On September 6, 1974, the defendant wrote a letter to Fazio stating that "[o]ur concern has reached the point where we wish to call a moratorium on issuing *any* further bonds (bid or performance) until we have had an opportunity to review additional information which [we] requested that you furnish to us." (Emphasis added.) Following a meeting of the parties in late September, the defendant placed a restriction on the parameters of Pace's construction bids, limiting Pace to projects of six or seven hundred thousand dollars per bid.

On June 27, 1975, the defendant issued a bid bond, through its agent Fazio. This bond was to be attached by the plaintiff to its proposal to construct senior citizens housing for the town of Trumbull at a cost of $625,000. This bid was accepted by the town. Fazio previously had assured the plaintiff that the requisite payment and performance bonds would follow if the contract were awarded to it. When informed of the prospective award of the project to the plaintiff, the defendant advised Fazio that it was refusing to issue performance and payment bonds for the project. Unable to obtain substitute bonding, the plaintiff lost the Trumbull contract. Pursuant to the bid bond furnished by the plaintiff, Trumbull made claim against the defendant for $5003, the spread between the Pace proposal and the next lowest bid. Although the defendant paid the claim and demanded indemnification from the plaintiff's principals under the blanket agreement of December 14, 1973, it never took legal recourse to obtain reimbursement. The plaintiff thereafter was unable to obtain supporting bonds necessary for obtain-

ing public construction contracts. Consequently, it was unable to obtain any new contracts. The plaintiff continued in business until 1979, when it ceased all operations.

The plaintiff commenced this action on February 22, 1977. In the first count of its substitute complaint, Pace sought compensatory damages for breach of an implied contract. The second count claimed compensatory damages for breach of an implied contract that the defendant allegedly was estopped to deny. Punitive damages were demanded in the third count on the ground that the defendant breached its implied contract in bad faith and "acted outrageously and maliciously toward the plaintiff with willful disregard for plaintiff's rights under the terms of its implied agreement with the plaintiff, and with the intention of causing [the plaintiff] severe economic and financial loss."

After trial, the jury made the following responses to interrogatories as the basis for its verdict: (1) Under its first count, the plaintiff proved the existence of an implied contract which obligated the defendant to issue as surety performance and payment bonds for the Trumbull project; (2) under the second count, the defendant was estopped to deny its obligation to issue as surety performance and payment bonds for the Trumbull construction; (3) the plaintiff's loss of profits on the Trumbull contract was $47,860; (4) the plaintiff's failure to obtain payment and performance bonds from the defendant resulted in its going out of business and causing it damages of $224,815; and (5) because the defendant acted in bad faith, the plaintiff was entitled to punitive damages of $68,168.

The defendant filed a motion to set aside the verdict and a motion for judgment notwithstanding the verdict. The plaintiff, in turn, filed a motion seeking an award of statutory interest on the compensatory dam-

ages awarded by the jury on the first two counts. All three motions were denied by the court and judgment was rendered upon the jury verdict.

The defendant's first two claims of error[3] challenge the denial of the motion to set aside the verdict and the denial of the motion for judgment notwithstanding the verdict. The defendant proposes several grounds in support of its claims.

I

CONSTRUCTION OF THE INDEMNITY AGREEMENT

The defendant's first argument challenges the trial court's interpretation of the General Agreement of Indemnity executed on December 14, 1973. The defendant asserts that paragraph nine of the indemnity agreement belies any claim of an implied contract to issue performance and payment bonds. That paragraph authorizes the defendant, "at its option [to] decline to execute or participate in, or procure the execution of, any such bonds without impairing the validity of this General Agreement of Indemnity." The trial court had dismissed this argument as a matter of law by ruling that while the defendant was free to refuse to issue any bid bond, once it chose to issue a bid bond there arose an agreement, implied in fact, that Travelers would issue the necessary performance and payment bonds.[4]

---

[3] The defendant's preliminary statement of issues lists thirty-eight claims of error which it has reduced in its brief to twenty in number. These numerous claims are, in effect, subsidiary points of law that are discussed under the three groupings of the principal issues on appeal. Practice Book § 3060F (a) and (d). We shall consider the claims of error in the form in which they have been briefed.

[4] The parties and the court agreed that the issue of the interpretation of the agreement was a question of law for the court. Although this procedure conflicts with what we perceive the current state of the law to be; see, e.g., *Harry Skolnick & Sons* v. *Heyman,* 7 Conn. App. 175, 179, 508 A.2d 64, cert. denied, 200 Conn. 803, 510 A.2d 191 (1986); *Finley* v. *Aetna Life & Casualty Co.,* 5 Conn. App. 394, 404, 499 A.2d 64, cert. granted, 198 Conn. 802, 501 A.2d 1213 (1985); we will decide the appeal on the theory on which it was tried and decided in the trial court.

The trial court refused to interpret paragraph nine of the agreement to "give the defendant carte blanche to avoid those undertakings it became obligated to perform." The court instructed the jury that it could use custom and usage to determine each party's obligations under an implied agreement. The court limited the jury's use of custom and usage by including the following prerequisites to any implied agreement: (1) that such business or trade usage existed at the time the bid bond was issued; (2) that any preconditions to the obligation imposed by such usage had been fulfilled; (3) that each party knew or had reason to know of such trade usage; and (4) that the plaintiff did not know, or have reason to know, that the defendant's intention was inconsistent with the trade usage. In charging the jury, the court framed the major issue as "whether it was the intent of the parties when entering into this agreement for the bid bond that the defendant be under an obligation to be a surety for the performance and payment bonds if the plaintiff was successful in its bid."

We agree with the trial court that paragraph nine of the agreement does not insulate the defendant from liability for refusing to issue a bond which it was otherwise obligated to issue.[5] The indemnity agreement primarily lists the obligations owed by the plaintiff, as indemnitor, to the defendant. By its terms, such obli-

---

[5] The defendant cites *Travelers Indemnity Co.* v. *Buffalo Motor & Generator Corporation,* 58 App. Div. 2d 978, 397 N.Y.S.2d 257 (1977), in support of its claim that paragraph nine of the indemnification agreement insulates the surety from liability for failure to issue a bond. That case was brought by the plaintiff surety seeking indemnity based upon its bid bond after the defendant defaulted subsequent to the award of a contract. The default was due to the defendant's inability to obtain the necessary performance bond. The court held that the language of the agreement clearly prohibited the defendant from asserting the plaintiff's failure to issue a bond as a defense to an indemnity action. That case is distinguishable from the present case, which is an action by the principal for breach of contract, rather than an action by the surety for indemnity. In the present case, the terms of the contract between the parties is directly at issue.

gations would mature if the defendant were required to pay on any bond which was issued on the plaintiff's behalf. The General Agreement of Indemnity, as its title implies, is an agreement of indemnification for losses on surety bonds issued by the defendant on request of the plaintiff. It does not obligate the defendant to issue any bond. In fact, there is no undertaking by the defendant whatsoever expressed in the "agreement." It is a unilateral grant of indemnification by the plaintiff to the defendant "in consideration of the promises, and the payment by the [defendant] of the sum of One ($1.00) Dollar to each of the Indemnitors, receipt of which is hereby acknowledged, and for other good and valuable [unspecified] considerations." It is not signed by the defendant, since it does not express any obligation undertaken by Travelers. Only the indemnitors have signed, sealed and acknowledged their signatures to the agreement to validate their obligations of indemnification as a prerequisite to the execution of surety bonds by the defendant. The court interpreted paragraph nine of the agreement merely to preclude the indemnitors, including L. F. Pace & Sons, Inc., from asserting the surety's failure to issue any bond as a defense to an action for indemnification for losses under any executed bonds. With this view we agree, for the clause expresses the plaintiff's understanding that the failure by the defendant to grant a surety bond will not impair "the validity of this General Agreement of Indemnity [as to indemnification under surety bonds issued by the defendant]." The trial court did not err, therefore, in finding that paragraph nine of the indemnity agreement did not preclude this action for a breach of an implied contract. The court, however, never instructed the jury that it could not consider the indemnity agreement in regard to custom and usage. The court instructed the jury to take all the relevant factors into consideration in making its determi-

nation. The court did not err in refusing to charge, as requested by the defendant, that on the basis of paragraph nine of the indemnity agreement it had the right to decline to issue a performance bond after the issuance of its bid bond.

## II

### IMPLIED AGREEMENT BASED UPON CUSTOM AND USAGE

The defendant argues that the court erred by introducing evidence of custom and usage as a basis for finding that an implied agreement to issue performance and payment bonds existed between the parties. The defendant asserts that custom and usage are inadmissible where the intent of the parties is expressed in a contract which is clear and unambiguous. The trial court correctly found that the indemnity agreement did not evidence the parties' intent as to the defendant's obligation to issue performance and payment bonds after issuing a bid bond. The trial court properly admitted evidence of custom and usage to demonstrate the existence and substance of an implied contract. Evidence of custom or usage is properly admissible when the subject matter, as here, is not a matter of common knowledge. *Jacobson Electric Co.* v. *Rome Fastener Corporation,* 156 Conn. 55, 60, 238 A.2d 415 (1968); see Calamari & Perillo, Contracts (2d Ed.) § 3-15. We reject the defendant's claim that the court erred in its instructions to the jury on the issue of custom and usage.

The defendant claims that such instructions permitted the jury to speculate as to the parties' intention based upon the general custom in the industry. The instructions allowed the jury to define the parameters of the parties' agreement by reference to trade custom and usage. In its instructions, the court also cautioned the jury that custom and usage would not be the

basis for the defendant's obligation if the plaintiff knew or had reason to know that the defendant had an intention inconsistent with such usage. The trial court's instructions were correct in law and reasonably adapted to the issues presented. *Patrick* v. *Burns,* 5 Conn. App. 663, 671, 502 A.2d 432 (1985), cert. denied, 198 Conn. 805, 504 A.2d 1059 (1986).

In its brief, the defendant also points to a claimed inconsistency between the jury instructions and the court's memorandum of decision relating to whether custom and usage may create an agreement or merely supplement an existing agreement. There is no such inconsistency in the court's position as expressed in its jury instructions, and later as expressed in its memorandum denying the defendant's motion to set aside the verdict and its motion for judgment notwithstanding the verdict. The claimed conflict is based upon parts of the charge taken out of context by the defendant. As the trial court observed relative to the defendant's claim that the court charged that a contract may be "created" by custom and usage, "the defendant in bolstering its claim ignores the court's instructions to the jury when it stated '[a]n agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type.' "

## III

### DAMAGES

### A

#### FORESEEABILITY

Several claims of error concern the jury's award of damages. The defendant claims that the jury award of consequential damages included losses which were not foreseeable at the time the parties entered into the alleged implied contract. It also alleges that the award

for lost earnings and profits from June 1, 1976, through May 30, 1979, were speculative and unsupported by the evidence.

"Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." 3 Restatement (Second), Contracts § 351 (1). The trial court charged the jury in accordance with this recognized general principle.[6] The jury implicitly found that such damages were foreseeable by the defendant at the time of the contract. This finding was supported by the following evidence: The defendant was aware that the plaintiff's business consisted almost exclusively of public construction which required bid, performance and payment bonds. There was evidence that the plaintiff was in a weakened financial condition. The defendant knew or should have known that failure to act as the surety on the performance and payment bonds, after acting as surety on the bid bond, could have a severe impact on the ability of the plaintiff to obtain the necessary bonds from other sources. The defendant was also aware that the continued inability of the plaintiff to obtain bonding would result in the termination of the business. The trial court's conclusion that there was sufficient evidence to support the jury's finding on the foreseeability of the damages was not in error. See *Murteza* v. *State,* 7 Conn. App. 196, 202–203, 508 A.2d 449, cert. denied, 200 Conn. 803, 510 A.2d 191 (1986).

B

FAIR MARKET VALUE AS A MEASURE OF DAMAGES

The defendant claims that the jury erred in awarding damages for the loss of the plaintiff's business where there was no evidence as to its fair market value

---

[6] The trial court instructed the jury that "damages awarded to the plaintiff cannot go beyond those which you can fairly find to have been in the contemplation of the parties at the time they made the contract."

as of the date of the breach. It also argues that there was no evidence that the plaintiff was required to maintain operations after 1976. The defendant asserts more specifically that lost profits could not be awarded because they were too speculative.

"There are no unbending rules as to the evidence by which [damages for breach of contract] are to be determined." *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 273, 320 A.2d 811 (1973). "The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . In making its assessment of damages for breach of [any] contract the trier must determine the existence and extent of any deficiency and then calculate its loss to the injured party. The determination of both of these issues involves a question of fact which will not be overturned unless the determination is clearly erroneous." *Beckman* v. *Jalich Homes, Inc.,* 190 Conn. 299, 309–10, 460 A.2d 488 (1983). As previously stated, damages are not recoverable where the party in breach could not reasonably have foreseen such damage as a probable result of the breach at the time the contract was made. 3 Restatement (Second), Contracts § 351.

We disagree with the defendant's claim that evidence of the fair market value of the plaintiff's business was insufficient to allow the award for damages. The trial court in its memorandum of decision specifically rejected the claim that the plaintiff's damages were limited to the difference between the fair market value of the business before the breach and the fair market value after the breach. The court held that the facts of this case were unusual and justified additional compensation for losses incurred in winding up the plaintiff's business. In evidence before the jury in its

consideration of the plaintiff's claim for damages were statements of income and retained earnings[7] prepared by its certified public accountants for the fiscal years ending May 31, 1972, through May 31, 1976. Supplementing these financial records were copies of the plaintiff's federal income tax returns showing operation income and expenses for the fiscal years ending May 31, 1977, through May 31, 1979. These financial statements were sufficiently detailed to provide probative evidence as to the plaintiff's losses. They substantiated the jury's award of $224,815 in compensatory damages for lost earnings incurred by the plaintiff in winding up its business as a result of the defendant's breach of contract. That the jury so concluded is established by its answer to the specific interrogatory proposed to it for its finding on this claim of loss.

The court's charge with respect to the measure of damages for loss of the plaintiff's business was proper. There was no error in its refusal to charge the jury, as requested by the defendant, on the measure of damages for loss of earnings and loss of the plaintiff's business. The jury's assessment of damages for loss of the plaintiff's business after the defendant's breach of contract was in accordance with the proper charge of the court. In acting on the postverdict motions of the defendant, the court did not err in finding that the evidence provided a sufficient basis upon which the jury could determine with a reasonable degree of certainty the loss resulting from the termination of the plaintiff's operations.

The defendant also makes the related claim that the trial court erred in allowing the jury to consider losses

---

[7] The term "retained earnings" is defined as "accumulated net income, less distributions to stockholders and transfers to paid-in capital accounts . . . . " Kohler, A Dictionary for Accountants p. 430. A general discussion of retained earnings is found in Davidson, Handbook of Modern Accounting chapter 27.

after June 1, 1975, as there was no evidence evincing that the plaintiff was required to maintain operations after such date. We find that the corporate tax returns were of sufficient particularity whereby the jury could reasonably have found that the plaintiff was compelled to maintain operations until 1979 in order to complete projects in progress at the time of the breach. The trial court properly submitted this issue to the jury and its finding was supported by the evidence.

Even if the evidence of losses after June 1, 1975, were admissible, the defendant argues that it was erroneous to allow the jury to calculate the amount of the plaintiff's damages based upon the differences in retained earnings from June 1, 1975, through May 31, 1979. It argues that retained earnings, an indicator of stockholder's equity, are irrelevant to the amount of damages suffered by the company. We agree that in certain cases retained earnings may be an inaccurate measure of loss to a corporation. Certain additions to, or subtractions from, the corporation's accumulated income which are not directly attributable to its normal day-to-day operations may be reflected as retained earnings. Consequently, changes in retained earnings would then indicate gains or losses not otherwise attributable to damages in a breach of contract action. That, however, is not the case here.

The retained earnings of the plaintiff for the period from June 1, 1975, through May 31, 1979, were based solely upon operational income. The same damages would have been proven by the plaintiff through a calculation of the corporation's net earnings or losses for the period June 1, 1975, through May 31, 1979. See 22 Am. Jur. 2d, Damages § 178. By the defendant's own computation in its brief, the total net loss for the period June 1, 1975, through May 31, 1979, as shown by the plaintiff's financial records, admittedly amounts to $224,186, rounded off. A comparison of the combined

retained earnings for the period in issue with the total operational losses reveals that they are the same.

The defendant also argues that it was error to award the plaintiff damages for losses incurred for the period June 1, 1975, through May 30, 1979, as such losses included overhead expenses incurred as a result of completing other projects and were not the probable result of the defendant's breach. It claims that the plaintiff completed its last project in 1976 and thereafter became defunct. It is not disputed that a significant amount of the losses incurred during the winding up of the plaintiff's business was the result of overhead expenses incurred as the result of other projects. They were, however, the natural result of contracts existing between the plaintiff and third persons at the time of the breach and were, in the circumstances of the case, foreseeable. In this regard, the trial court stated in its memorandum of decision that "[a]s the defendant knew, the plaintiff had contract obligations that had to be completed, and the application of the entire overhead for the remaining business resulted in severe losses."

The trial court instructed the jury relative to the plaintiff's claim of resulting damages as follows: "You must take all the evidence into consideration, determine first whether the plaintiff proved its loss of profits with reasonable certainty; and, second, the amount of such loss is a question of fact for you to determine. Next, the plaintiff urges you to consider as an element of damage the loss it sustained as a result of the corporation going out of business. The claim is that as a result of the defendant's breach of the implied contract to furnish the performance and payment bonds, it was unable to get another surety company to write bid, performance or payment bonds, and eventually became defunct or went out of business. . . . Loss of earnings is an element which you may consider in deter-

mining the amount of damages, provided that you find proven that the plaintiff went out of business as a result of the defendant's breach of contract by refusing to issue the performance bond for the Trumbull job. . . . You must look at the entire picture and take into consideration all the relevant evidence in determining whether, first of all, the plaintiff has proven by a fair preponderance of the evidence that the corporation went out of business as a result of this breach of contract in 1975, and the reasonable losses attendant to that going out of business; [that] loss of profits during the period of time in question, remembering that the burden of proof is on the plaintiff to prove [its] damages by a fair preponderance of the evidence. . . . The plaintiff must not only prove its losses with reasonable certainty, and that they resulted from the breach of contract by the defendant, but it must also prove that they were reasonably within the contemplation of the defendant when the contract was made. In making those determinations, you may consider the evidence given by the accountant . . . and all other relevant evidence in determining these facts."

Lost earnings may be awarded only where they are reasonably certain to result from the breach. 22 Am. Jur. 2d, Damages § 172. The jury's finding in this regard was reasonable. We cannot conclude, therefore, that the trial court erred in refusing to set aside the jury's award of damages.[8] See *Murteza* v. *State*, supra, 202–203.

---

[8] The jury's award of compensatory damages for this loss based upon its answer to question seven of the interrogatories submitted to it was $224,815. The amount of this award appears to be in excess of the proof of $224,185 and was probably due to a transposition of figures.

The defendant claims for the first time in its reply brief that the trial court erred in its instructions to the jury in failing to limit the computation of the amount of damages to that described by the plaintiff in response to an interrogatory from the defendant. We will not review a claim raised for the first time in the defendant's reply brief. *R.A. Civitello Co.* v. *New*

## IV

### Punitive Damages

The defendant claims that it was error for the trial court to allow an award of punitive damages on the third count in this action for breach of contract. The trial court allowed punitive damages on the third count as an extension of the doctrine expressed for the first time in our jurisdiction in *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.,* 34 Conn. Sup. 46, 375 A.2d 428 (1977). In *Grand Sheet Metal,* the trial court overruled the defendant's demurrer to the plaintiff's complaint asserting a tortious breach of contract and seeking recovery against its fire insurer beyond the amount of the policies in question on the ground of bad faith business conduct. The court's ruling was on the ground that a bad faith breach of contract gave rise to a distinct tort claim, following *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal. 3d 566, 510 P.2d 1032, 108 Cal. Rptr. 480 (1973). *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.,* supra, 50. The California Supreme Court in Gruenberg held: "It is manifest that . . . in every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is immanent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Gruenberg* v. *Aetna Ins. Co.,* supra, 575.

The trial court, in its memorandum of decision, explains its reasoning for allowing punitive damages to the plaintiff in this manner: "Granted that this case

*Haven,* 6 Conn. App. 212, 217 n.5, 504 A.2d 542 (1986). We also note that the defendant has not alleged that an exception to the charge on such ground was made to the trial court. See Practice Book § 315.

may be an extension of *Grand Sheet* by applying the doctrine to a situation other than for the payment of a claim under a contract of insurance. Nevertheless, this case dovetails with the reasoning of *Grand Sheet* and fulfills the tort test for punitive damages. 'In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence.' *Venturi* v. *Savitt, Inc.,* 191 Conn. 588, 592 [468 A.2d 933] (1983). It is clear that tort law has no exclusivity on punitive or exemplary damages. Surely, 'exemplary damages may be awarded for breach of contract, but only when the breach is aggravated by particularly egregious conduct on the part of the defendant.' *Central Armature Works* v. *American Motorists Insurance Company,* 520 F. Supp. 283, 291 [D.D.C. 1981]."

The plaintiff's claim for attorney's fees as punitive or exemplary damages is predicated on paragraph twenty-seven of the third count in the substitute complaint which alleges: "In so refusing in bad faith to give plaintiff said payment and performance bond as represented, and in so misleading plaintiff, the defendant acted outrageously and maliciously toward the plaintiff with willful disregard for plaintiff's rights under the terms of its implied agreement with the plaintiff, and with the intention of causing it severe economic and financial loss."

The guiding principle of law applicable to the recovery of punitive damages for breach of contract obligations, express or implied, is expressed in *Triangle Sheet Metal Works, Inc.* v. *Silver,* 154 Conn. 116, 127, 222 A.2d 220 (1966): "Punitive damages are not ordinarily recoverable for breach of contract. Restatement, 1

Contracts § 342; 5 Corbin, Contracts § 1077; McCormick, Damages § 81. This is so because, as lucidly reasoned by Professor Corbin in the passage cited, punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship. The few classes of cases in which such damages have been allowed *contain elements which bring them within the field of tort.* It is, of course, settled law that, in certain cases of tort, punitive or exemplary damages may properly be awarded." (Emphasis added.)

Breach of contract founded on tortious conduct may allow the award of punitive damages. Such tortious conduct must be alleged in terms of wanton and malicious injury, evil motive and violence, for "punitive damages may be awarded only for 'outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others.' Restatement, 4 Torts § 908, comment (b)." *Triangle Sheet Metal Works, Inc.* v. *Silver,* supra, 128. Thus, there must be an underlying tort or tortious conduct alleged and proved to allow punitive damages to be granted on a claim for breach of contract, express or implied. Elements of tort such as wanton or malicious injury or reckless indifference to the interests of others giving a tortious overtone to a breach of contract action justify an award of punitive or exemplary damages. In our jurisdiction such recovery is limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs.

Our review of paragraph twenty-seven of the third count of the plaintiff's complaint discloses allegations of tortious misconduct by the defendant in its refusal to furnish the payment and performance bonds in violation of its implied contract after issuing the bid bond on the Trumbull project. In substance, the plaintiff alleges therein malicious and wanton misconduct which

would justify an award of exemplary or punitive damages in its assertion that "the defendant acted outrageously and maliciously toward the plaintiff with wilful disregard for plaintiff's rights under the terms of its implied agreement with the plaintiff, and with the intention of causing it severe economic and financial loss."

The court, therefore, did not err in refusing to instruct the jury, as requested by the defendant, (1) that since this is a breach of contract action, punitive damages are not recoverable as a matter of law, and (2) that since there is no contract of insurance, any claim for bad faith must fail as a matter of law. Our review of the court's charge with respect to punitive damages for bad faith breach of contract shows that it comported with the law. The court did not err in this regard as further claimed by the defendant.

The defendant also challenges the jury's finding of sufficient evidence to support its award and amount of punitive damages. Specifically, the defendant asserts that the evidence was insufficient to substantiate the plaintiff's allegation in its third count that the "defendant acted outrageously and maliciously toward the plaintiff with willful disregard for plaintiff's rights under the terms of its implied agreement with the plaintiff, and with the intention of causing it severe economic and financial loss." The record demonstrates, and the jury could reasonably have found, that the defendant's manager refused to review the plaintiff's current financial statements before refusing to issue performance and payment bonds on the Trumbull project. The jury also could reasonably have found from the testimony of Vincent J. Fazio that the defendant's manager "was going to get me and he was going to get the Paces." In its answer to interrogatory number eight, the jury affirmatively found that "the plaintiff Pace [did] prove under the Third Count that the defendant Travelers

acted in bad faith in breaching its contract and it was entitled to punitive damages." We cannot hold that the jury's conclusion that the defendant acted in malicious and wilful disregard of the plaintiff's rights was unsupported by the evidence. *Eagar* v. *Barron,* 2 Conn. App. 468, 470, 480 A.2d 576 (1984).

The defendant also challenges the amount of punitive damages, claiming that there was insufficient evidence demonstrating the reasonableness of the plaintiff's litigation expenses. We need not consider the merits of this claim, as no objection was made at trial to the introduction into evidence of the retainer agreement between the plaintiff and its attorney which provided for legal fees of 25 percent of the recovery. See *Deedy* v. *Marsden,* 172 Conn. 568, 570, 375 A.2d 1032 (1977).

## V

### EVIDENTIARY RULINGS

During the course of the trial, the defendant attempted to admit into evidence two letters of intent purportedly issued by the defendant, through its attorney-in-fact, Vincent J. Fazio. These letters of intent were offered only for the purpose of attacking the credibility of the plaintiff's witnesses, specifically Michael Pace and Fazio. The plaintiff objected to this offer on the ground that the letters were not authenticated. Fazio testified that the signatures that appear on these letters were not his. The plaintiff also claimed that these documents, which related to bonds issued prior to the Trumbull project, were collateral to the case and therefore could not be used for impeachment purposes. The trial court sustained the objection on both grounds. With respect to the issue of relevancy, the trial court has broad discretion in such matters and may only be reversed where such discretion is abused. *Turgeon* v. *Turgeon,* 190 Conn. 269, 273–74, 460 A.2d 1260

(1983). The defendant argues that if it could authenticate the signatures on these documents, it would show that one of these two witnesses was not credible. We disagree. Pace testified that the letters of intent were issued from Fazio's office. Fazio testified that he never signed these letters and that no other person in his office was authorized to sign such letters. The trial court's finding that this evidence was not relevant to the issue of credibility was not an abuse of discretion. We also agree with the trial court that the offer of these letters amounted to an impermissible collateral attack upon the credibility of a witness. See Tait & LaPlante, Connecticut Evidence § 7.24.

## VI

### PROMISSORY ESTOPPEL

The defendant's final claim is that the trial court erred in instructing the jury on the doctrine of promissory estoppel. The jury specifically found that an implied contract existed between the parties. Therefore, the issue of estoppel was never reached. For this reason, the trial court properly declined to review this claim.

## VII

### PLAINTIFF'S CROSS APPEAL FOR INTEREST

The plaintiff appeals from the trial court's denial of the plaintiff's postjudgment motion for prejudgment interest on the award of compensatory damages.[9] This issue of interest had not been submitted to the jury. The trial court denied the plaintiff's motion, finding that the decison to award prejudgment interest was

---

[9] Although the plaintiff, in its preliminary statement of issues, claims that the court erred "in denying Plaintiff's Motion for Interest on the jury's award for breach of contract, attorney's fees and punitive damages," his postverdict motion requested interest only "on the [compensatory] damages as awarded by the jury in Counts One and Two."

a question of fact for the jury. The plaintiff's motion, therefore, came too late. "It is well established that '[t]he amount of damages to be awarded is a matter particularly within the province of the jury.' *Eagar* v. *Barron,* [supra, 471]." *Canton Motorcar Works, Inc.* v. *DiMartino,* 6 Conn. App. 447, 463–64, 505 A.2d 1255, cert. denied, 200 Conn. 802, 509 A.2d 516 (1986). The issue of interest was not raised in a timely fashion so as to allow the matter to be placed before the jury. The trial court correctly concluded that it then lacked the authority to award interest in this case.

There is no error on the defendant's appeal or on the plaintiff's cross appeal.

In this opinion the other judges concurred.