[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case concerns title to approximately two and a half acres of property, improved with a single-family dwelling, and located at 49 Laurel Ledge Court in Stamford. General Statutes 47-31 (f)[1] The controversy is between two brothers, the plaintiff Alan S. Hager, and the defendant John Hager.[2] The property in question was owned by their mother, Alice Hager, who obtained title from one Ruthann Cheifetz on December 15, 1980. On that same date Mrs. Hager gave her son John, the defendant, a power of attorney, which included the right to engage in real estate transactions.[3]
Approximately four years later, on February 19, 1985, John, purporting to use this power of attorney, quitclaimed his interest in the property to defendant Walter S. Jennings as trustee.[4] Some two months later, on April 29, 1985, Alice Hager quitclaimed her interest in the property to her son Alan, the plaintiff.
The complaint is in five counts: (i) the first alleges that the plaintiff Alan acquired title from his mother, the rightful owner, which title is also claimed by the defendant John; (ii) the second count claims that although title was taken in the mother's name in 1980 "it was expressly understood" between Alan and his mother that he would have the "beneficial ownership" of the property; that the power of attorney from the mother to John was only to be used in the event of her and Alan's illness or incapacity, neither of which event had occurred; and that the conveyance to Jennings was without Alice's permission and without consideration, was fraudulent and constituted a breach of the "fiduciary and confidential relationship" owed by John to his mother; (iii) the third claims that the use of the power of attorney by John and his deed to Jennings constituted fraud as to the plaintiff, and that the defendants had failed to disclose to him material facts regarding this transaction; (iv) the fourth count alleges conversion and conspiracy by the two defendants; and (v) the last count asserts that John did not have the authority to convey title to Jennings, and that a constructive trust should be imposed for the plaintiff's benefit. The claims for damages include a request for a constructive trust, a judgment quieting title in the plaintiff, the setting aside of the conveyance to Jennings, monetary damages, attorney's fees and punitive damages.
The defendant John Hager filed several special defenses and a counterclaim. He alleges that in order to be CT Page 10521 enforceable the purported oral agreement between Alice and Alan, giving the latter beneficial ownership of the property, would necessarily have to have been in writing pursuant to General Statutes 52-550,[5] which it was not. John also claims that he paid a good portion of the money used to purchase the property and, accordingly, that he has the right to the beneficial ownership thereof. The defendant also filed a counterclaim to the effect that he had purchased a $20,000 certificate of deposit, but that Alan had forged his name and converted the money to his own use. John also repeats in the counterclaim the substance of his special defense that he is entitled to the beneficial ownership of the subject premises because he paid good and valuable consideration therefor.
Since each brother claims that he paid for the purchase of the Laurel Ledge Court premises, the starting point for this analysis is to determine what was paid to the seller at the closing and by whom. First, the deposit check was in the form of a cashier's check for $18,000, and although the check was signed by John, the money came from a business owned and operated by Alan. Both the binder agreement and the contract of sale were signed "John Hager, Power of Attorney in fact for Alice Hager," and "John Hager, her attorney in fact," respectively. The purchase price in the sale from Cheifetz to Alice Hager was $180,000 and the seller took back a purchase money mortgage signed by Alice for $37,000. This means that after subtracting $18,000 for the down payment, $125,000 was paid to Cheifetz at the closing. The evidence indicates that payments on this purchase money mortgage were thereafter made solely by the plaintiff Alan. The balance due at the closing was paid with a number of bank checks, plus a check for $44,245 from a New York City law firm, Crystal and Driscoll. This $44,245 represented a refund of a deposit on a purchase of a co-op in New York City, which was never consummated. Title in the co-op was to have been in Alice's name but the co-op would have been occupied by Alan and his family, and he paid the deposit from his own personal funds. In addition to the co-op deposit refund, a number of bank checks were paid to the seller and drawn on accounts at Dry Dock Savings Bank, Community Banking and Chemical Bank. These accounts belonged to two companies, U.S. Dollar Galleries and Silver Dollar Specialists Unlimited. John claims he owned these two businesses, and he points to the fact that the certificates of doing business in a trade name relating to the two companies, which were filed in 1979, are both in his name, Also, the account at Chemical Bank for U.S. Dollar Gallaries was in his name. The evidence, however, discloses that these two companies belonged to Alan Hager both before CT Page 10522 and after the closing, and that these bank checks therefore represent his money. Alan was an expert in numismatics, and in particular was an authority on U.S. silver dollars. He worked full time at these businesses. John Hager, on the other hand, had no experience in the coin business and very little if any capital, and was employed by Alan in a relatively minor role.
The explanation for the use by Alan of John's name on the business certificates and on certain bank accounts was that Alan was attempting to impress, John's parole board in Virginia, where John had been incarcerated in 1980 for breaking and entering. Alan permitted his brother to use his own name on the business certificates in order to persuade the Virginia authorities that John actually owned some businesses and was a valuable member of the community.[6] Moreover, a number of tax returns were introduced into evidence, which indicated that the coin companies belonged to Alan, and that he paid taxes on the profits of these businesses. John, on the other hand, conceded that he never paid any taxes in connection with these businesses.
Thus, I believe that the money for the purchase of the premises in question came from Alan, not John, because, with the exception of the return of the deposit on the co-op, it all came from two coin businesses which belonged to the plaintiff.
In addition, the selling broker testified that her dealings and negotiations in connection with the purchase of the subject premises were exclusively with Alan and his wife, not John, except on one occasion when the latter delivered something to her.
Another important factor in this case is that Alan, his wife and children moved into the house right after the closing. It is possible that perhaps John stayed there a night or two before Alan moved in, but there is no question that Alan occupied the home with his family, and as a matter of fact still does. The evidence is also clear that in addition to paying the purchase money mortgage, which was ultimately released in 1982, he also paid the real property taxes, insurance and maintenance charges for the home. In addition, the plaintiff spent over three hundred thousand dollars for significant improvements to the premises, which roughly doubled the size of the house, including a four-car garage and a new road to the rear of the premises. Not only did John not live in the house, he never paid anything for taxes, insurance, maintenance or improvements. CT Page 10523
The plaintiff maintained possession of the premises without any challenge by his brother until February 1985, when they had a physical altercation in New York at a trade show for coin dealers at which Alan broke his brother's nose. Within a month or so thereafter, Attorney Jennings, purporting to act as trustee of the property for John, commenced a summary process action against the plaintiff.[7]
This action was subsequently dismissed for improper service and never pursued thereafter.
In summary, this court concludes from the evidence that Alan paid for the property, moved in after the closing, and treated the property as his own without protest from his brother John for some four and one-half years, until a dispute arose between the two brothers culminating in fisticuffs in early 1985. Moreover, approximately two months after the defendants, John Hager and Attorney Jennings, initiated the summary process action against Alan, the mother, Alice Hager, quitclaimed her interest in the subject premises to Alan.
The evidence also discloses that while living in California before moving to this state, Alan placed title to his home in his mother's name, because he feared suits involving his coin business, and also because there was an outstanding judgment against him. He declined to put title to either the California or the Stamford property in his wife's name because evidently his marriage was somewhat shaky at that point. In other words, placing his home in his mother's name was not something new for Alan, nor does his mother claim any interest in the property by virtue of the fact that title was in her name.[8] Furthermore, is mentioned previously, Alice ultimately quitclaimed her interest in the premises to the plaintiff in any event. In this connection, an attorney testified he met with Alan and his mother in April 1985, and that in the presence of his mother Alan said that she wanted him to have the property, at which point the quitclaim deed to the plaintiff was executed by Alice Hager.
The quitclaim deed from John to Jennings raises the issue of whether an agent such as John had the right pursuant to his power of attorney to convey the property to himself. It is true, of course, that General Statutes 1-44(2) authorizes an "agent" to quitclaim property. Agency is defined as "the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, CT Page 10524 and consent by the other so to act . . . . Restatement (Second), 1 Agency 1." McLaughlin v. Chicken Delight, Inc., 164 Conn. 317,322, 321 A.2d 456 (1973).
Moreover, as was stated in Beckenstein v. Potter Carrier. Inc., 191 Conn. 120, 138, 464 A.2d 6 (1983): "[A]n essential ingredient of agency is that in order to find an agency relationship, the agent must be working at the behest and for the benefit of the principal." In this case John attempted to convey his mother's interest in the subject premises to himself, which I believe breached the fiduciary duty he owed to his mother. Where a fiduciary holds title to real property only in his fiduciary capacity, he has "no interest in the fee to the real estate which he could convey." Hartford National Bank Trust Co. v. Willard,175 Conn. 372, 380, 398 A.2d 1186 (1978).
Furthermore, since Alice Hager agreed that she did not pay any money to purchase the premises, or claim any ownership rights therein, I believe a resulting trust was established for the benefit of the plaintiff. Alan paid for the property, but had title to it placed in his mother's name. This created a resulting trust as defined in Spatola v. Spatola, 4 Conn. App. 79, 82, 492 A.2d 518 (1985) ("A resulting trust arises by operation of law at the time of a conveyance when the purchase money for property is paid by one party and the legal title is taken in the name of another").
Under this theory the Alice held the property in trust for Alan, and therefore did not have free and clear title to the premises, the quitclaim deed that John used as her agent to transfer to Jennings his principal's property also resulted in a trust in favor of Alan. Short Beach Cottages Owners improvement Assn. v. Stratford, 154 Conn. 194, 199,224 A.2d 532 (1966) ("It is of course fundamental that the owner of an interest in property cannot convey a greater title than he possesses."); Restatement (Second) Trusts 408 (1959) (where the trustee transfers property held in a resulting trust and the transferee is not a bona fide purchaser, the transferee does not hold the property free of the resulting trust) See also Campbell v. Kirby,239 N.W.2d 792, 195 Neb. 610 (1976). Alice held legal title to the premises only as trustee because a resulting trust was in effect, and in the absence of a bona fide purchaser, the resulting trust continued. Thus neither John Hager nor Mr. Jennings acquired fee simple title to the property.
Accordingly, I believe that the plaintiff has sustained his burden of proof that title should be quieted in his CT Page 10525 name, and a judgment to that effect is hereby ordered, and in addition, all claims of the defendants to the property are ordered extinguished. "[T]he relief afforded by the action to quiet title is a full determination of the rights of the parties in the land." DeVita v. Epstein, 13 Conn. App. 101,104, 535 A.2d 364 (1987).
The plaintiff's request for punitive or exemplary damages, including attorney's fees, on the basis that John acted fraudulently, wilfully and wantonly, is denied, as I do not believe that the existence of such conduct was adequately established. L. F. Pace Sons. Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 47-48, 514 A.2d 766, cert. denied 201 Conn. 811, 516 A.2d 886 (1986).
The plaintiff does admit to signing his brother's name to a $20,000 treasurer's check on Community Banking Company of East Haven dated June 13, 1981, and made payable to John Hager. This check originated with a certificate of deposit for $20,000 in John's name. Alan also admits that he owed his brother this same $20,000 in connection with another company that plaintiff owned. Alan Hager claims that he paid this debt to John with some other funds, but I find no evidence of that, and therefore, as to the counterclaim, it is adjudged that the plaintiff owes John Hager the sum of $20,000, plus interest thereon pursuant to General Statutes37-3a at ten per cent per years from June 23, 1981, the date he wrongfully signed John's name, to the date hereof, as it was money wrongfully withheld. Harris Calorific Sales Co. v. Manifold Systems. Inc., 18 Conn. App. 559, 565,559 A.2d 241 (1989). This interest is calculated as amounting to $20,955.54, for a total judgment in John's favor for $40,955.54.
In conclusion, title to 49 Laurel Ledge Court in Stamford is quieted in the name of Alan S. Hager, and judgment may enter accordingly. Further, judgment is rendered in favor of John Hager on his counterclaim for $40,955.54. No costs are awarded to either party.
So ordered.
Dated at Stamford, Connecticut this 16th day of December, 1991.
WILLIAM B. LEWIS, JUDGE