[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action involving a commercial landlord-tenant relationship, the plaintiff seeks to recover damages in the nature of unpaid rents, utility bills and for physical injury to the leased premises. On the other hand, the defendants claim that the plaintiff misrepresented the area that was leased causing them to be overcharged for rent and utilities, that the plaintiffs' conduct constituted a violation of CUTPA[1] and that their security deposit is being wrongfully withheld. At the trial, testimonial, photographic and documentary evidence was introduced. From the evidence including reasonable inferences, the court finds that the facts set forth below have been established.
 I.
On July 2, 1992, a written lease was entered into between the parties for a term of three years commencing on July 1, 1992 and ending on June 30, 1995 with an automatic extension for an additional three years unless at least six months before the end of the original term the lessee notified the lessor that the extension was unwanted. The purpose of the lease was to enable the defendants to operate a children's clothing store in a strip mall owned by the plaintiff. The rented premises were described in the lease as follows:
Approximately 1,800 square feet, more or less CT Page 5808 . . . to be located at 517A Boston Post Road, Orange, Connecticut hereafter called "Shopping Center" as shown on Exhibit A attached hereto and made a part hereof with the leased premises being outlined in red.
 Together with the right to the nonexclusive use, in common with others of all such automobile parking areas, driveways, footways, and other facilities designed for common use, as may be installed by the lessor and of such other facilities as may be provided or designated from time to time by the lessor for the common use, subject to the terms and conditions of this lease and reasonable rules and regulations for the use thereof.
The defendant Deborah J. Schaefer signed the lease as president of The Green Giraffe, Inc. and again as an individual lessee.
An escalating schedule of rents is set forth in the lease. The listed schedule is a minimum annual rent of $23,400.00 for the period from July 1, 1992 through June 30, 1993; $24,570.00 for July 1, 1993 through June 30, 1994 and $25,798.56 for July 1, 1994 through June 30, 1995. For the extended three year term, there is a similar schedule at higher amounts. The lease provides that all minimum annual rents are to be paid in equal monthly installments.
In addition to the minimum annual rents, utility charges are described in the lease as additional rents. The lease recites "[t]he parties agree that lessee's share of gas and electricity shall be 75% of the charges for the unit of approximately 2500 square feet identified as 517A Boston Post Road." Contemporaneous with the execution of the lease, the defendants deposited with the plaintiff the sum of $3,900.00[2] as a security deposit.
Deborah Schaefer first saw the subsequently rented store in the company of her mother a real estate agent. The size was represented in the multiple listing document to be 2500 square feet a figure in excess of Schaefer's need. In her written business plan for The Green Giraffe, a store size of approximately 1500 square feet in a strip shopping center on the Boston Post Road is mentioned.
The plaintiff agreed to divide the store and Deborah Schaefer CT Page 5809 and her mother indicated where the dividing wall should be placed. A proposal to lease was initialed by James Rosen for the plaintiff and by Deborah Schaefer on June 18, 1992. The proposal does not say anything about the amount of square footage being rented to the defendants but it does note the division of utilities at 75% for The Green Giraffe, Inc. and 25% for the lessor that is repeated in the lease. On June 18, 1992 when the proposal was prepared there was no discussion between the parties as to square footage.
In the formal lease signed on July 1, 1992, the day that the defendants moved in, the premises, as noted earlier, are described as having 1800 square feet more or less. James Rosen testified that square footage dimensions were used only because of Multiple Listings requirements but that the store rented to the defendants and the other stores in the plaintiffs' building as well were not leased on a square foot basis. Rather, according to James Rosen, they were rented as separate stores with the square footage figures being used only as identifiers. Rosen emphasized that the wall separating the leased premises from the area that he made into his office was placed where Deborah Schaefer wanted it to be and that is why he said the area in the lease was described as 1800 square feet more or less. When asked on cross examination if the square footage charge was $13.00 for the first year since 13 times 1800 equals $23,400 the amount of the first year's minimum annual rent, James Rosen's response was that it was just a coincidence that the product of 13 times 1800 and the amount of the first year's rent, were the same.
Contrary testimony came from Deborah Schaefer who said that she believed that the original space was 2500 square feet and that she agreed to the location of the wall to be built because it would provide her with two-thirds of the space or 1800 square feet. She also said that James Rosen calculated the number of square feet by counting the ceiling tiles and multiplying the number times the dimension resulting in a square footage of 1850 to be leased.
On November 10, 1994, Michael Horelad, the District Manager for Resource Management Services wrote to the plaintiff on behalf of the defendants. The plaintiff was informed that an internal audit of The Green Giraffe including lease and space requirements was in progress and that Steinberg Associates, an engineering firm, was going to physically examine the leased space. The letter also requested a copy of Exhibit A stated in the lease to be a drawing of the shopping center with the leased premises outlined in red for the reason that, despite the language, of the lease Exhibit A was CT Page 5810 not attached to the defendants' copy. When Barry Steinberg measured the defendants' space he found that going to the outside of the exterior walls and to the middle of the demising walls showed the leased premises to be only 1605 square feet.
The discrepancy between the amount of square footage stated in the lease and the amount of actual footage found by Barry Steinberg resulted in a certified letter to the plaintiff from the defendants' attorney. The letter asked for a refund of $6,594.14 based on the difference in space within seven days.
Differences involving square footage have also existed with some of the plaintiff's other leases. In 1992, David Kish the president of Eastern Looms Oriental Rug, Inc., the tenant at 519C and 519D Boston Post Road discovered that the actual space leased was 280 square feet less than the "approximately 5000 square feet" described in his lease. After receiving several letters, James Rosen reduced Eastern Looms' rent from $4,000.00 to $3,800.00 per month. Judy Green an evicted former tenant at 517B Boston Post Road testified that the store she had rented contained only 1875 square feet and not 2100 square feet as stated in the plaintiff's multiple listing form.
The defendants vacated the plaintiff's premises and returned the keys on February 28, 1995. The Green Giraffe is now located at 500 Boston Post Road where the leased premises consist of 1420 square feet and the monthly rent from April 1, 1995 through March 31, 1997 is $1,856.78. The premises formerly occupied by the defendants has been leased by the plaintiff effective October 31, 1995 to Norwest Financial Connecticut, Inc. at a rental in excess of what the defendants were paying. The new lease describes 517A Boston Post Road as containing approximately 1700 square feet.
Included in the plaintiff's damage claims are unpaid monthly rents from January through June, 1995 with late charges as permitted by the lease, unpaid heating and utility bills that were to be apportioned 75% to the defendants and 25% to the plaintiff for James Rosen's office as well as an attorney's fee as provided in the lease. There was testimony concerning the physical state of the premises when the defendants vacated but only estimates to repair were offered and the court ruled then inadmissible. The defendants seek reimbursement for over payments of rent and utilities, a return of their security deposit and punitive damages and an attorney's fee under CUTPA. This case, however, was supposed to be tried to a fact-finder pursuant to General Statutes CT Page 5811 § 52-549n et seq. and Practice Book § 546D. At the time the parties agreed that their respective damages would be under $15,000.00.[3]
They have not departed from their agreement.
A few more findings have been made. They will appear in the next sections of this memorandum.
 II.
A lease is both a conveyance of an interest in realty and a contract. Boulevard Associates v. Sovereign Hotels, Inc.,852 F. Sup. 127, 131 (D. Conn. 1994). When a lessee, during the existence of a lease, during the existence of a lease, moves from the premises and refuses to pay further rent, as the defendant here has done, two courses of action are available to the lessor. The lessor may refuse to accept the surrender of the lease in which case he may let the property lie idle or re-rent it as the agent of the lessee. Or the lessor may accept the surrender by which act the lease is terminated giving the lessor a cause of action for breach of contract. Whether a taking of possession of the premises constitutes a termination of the lease depends upon the intent of the lessor. Sagamore Corporation v. Willcutt, 120 Conn. 315, 317-318
(1935); Rokalor, Inc. v. Connecticut Eating Enterprises, Inc.,18 Conn. App. 384, 388 (1989).
At the outset, the court must decide on which of the two options the plaintiff is proceeding. In the absence of any definitive statements on behalf of the plaintiff, the ascertainment of intent becomes a matter of inference derived from circumstantial evidence. State v. Baldwin, 224 Conn. 347, 355 (1993). Although the defendants vacated on February 28, 1995, the initial term in the lease did not end until June 30, 1995. On June 7, 1995, however, the plaintiff on a prejudgment application secured an attachment of $13,000.00 from Judge Hodgson and on June 12, 1995 its complaint was served upon the defendants. The proper conclusion is that before the lease expired, the plaintiff accepted the surrender, terminated the tenancy and now is pursuing its suit for breach of contract. Sagamore Corporation v. Willcutt, supra at 318; K R Realty Associates v. Gagnon, 33 Conn. App. 815, 821
(1994).
"The measure of damages for breach of a contract is the actual loss sustained by reason of the breach, which is the monetary value of what the promisee would have [received] if the contract had been performed, less the proper deductions." Rowan ConstructionCT Page 5812Corporation v. Hassane, 17 Conn. App. 71, 80 (1988). As a general rule, the award of damages, in contract cases, is designed to place the injured party in the same position as he would have been had the contract been performed. Jacobs v. Thomas, 26 Conn. App. 305,313 (1991). In contradistinction, however, to situations where a lessor continues a tenancy by refusing to accept the surrender of a lease, Dewart Building Partnership, 4 Conn. App. 683, 687 (1985), the lessor who elects to terminate the tenancy has a duty to mitigate damages K R Realty Associates v. Gagnon, supra,; Rokalorv. Connecticut Eating Enterprises, Inc., supra.
Applying the foregoing principles to the facts underlying the plaintiff's claims, the court reaches the conclusions hereinafter set forth. The defendants did not pay rent for the last six months of the initial term (January — June 1995). The installment for each month is $2149.88 so that for rent the sum of $12,899.28 would be due in addition to a late charge of $1,504.92 as permitted by the lease. For items classified by the lease a additional rent, there is the sum of $1,140.00 representing 75% of the electric bill and the sum of $238.00 representing 75% of the gas bill for the final six months of the term. There is also due and owing as additional rent the sum of $252.80 being 75% of the cost of renovation and repair to the air conditioner. In addition to the above, the plaintiff asks for reimbursement in the amount of $900.00 for trash removal during the defendants' actual thirty month occupancy. Trash removal under the lease, however, is the responsibility of the lessor except for cartons and large items. Finally, the plaintiff would be able to claim interest charges at the rate of 1.5% per month on utility and service charges that remained unpaid more than thirty days after their respective due dates. The evidence, however, is insufficient to permit a proper computation of these charges. Before considering mitigation of damages, the plaintiff's total claim, exclusive of an attorney's fee, is ascertained to be $16,934.20.
The photographs introduced as exhibits showed that some damage occurred to walls and soffits, a partition was enlarged and, in the children's play area, a piece of the carpet was cut out and a different color carpet was inserted in its place. Probably the physical condition of the premises after the defendants vacated would have qualified as foreseeable consequential damages.Boulevard Associates v. Sovereign Hotels, Inc., 861 F. Sup. 1132,1136 (D. Conn. 1994); see L.F. Pace Sons, Inc. v. TravelersIndemnity Co., 9 Conn. App. 30, 39-40, cert. denied 201 Conn. 811
(1986). But, as heretofore stated, no admissible evidence relating CT Page 5813 to the cost of repairs or how these items diminished the value of the plaintiff's store or building was offered.
The physical condition of the premises after the defendants, departed is relevant, however, to the vacancy that existed throughout the last six months of the term. In an action for breach of a lease, the amount of rent agreed to by the parties is a proper measure of damages. Rokalor, Inc. v. Connecticut EatingEnterprises, Inc., supra at 389-90. The plaintiff, however, is also under an obligation to make reasonable efforts to mitigate the damages resulting from the defendants' actions. Danpar Associatesv. Somersville Mills Sales Room, Inc., 182 Conn. 444, 446 (1980). What constitutes a reasonable effort under the circumstances present in a specific case is a question of fact for the trier. Id. But in a landlord-tenant situation, the obligation to mitigate includes taking steps to re-let the premises. Rokalor, Inc.,supra. James Rosen is a licensed realtor. Judging from the photographs, three months was a sufficient time to put the premises in rentable condition. No explanation was given as to why the premises remained vacant until occupied by a new tenant under a new lease on October 31, 1995. Accordingly, the court reduces the plaintiffs' claims for rent including the late charge to three months or $7,196.75 and the claims for the electric and gas bills similarly to $689. The one time charge for renovation of the air conditioner remains at $252.80 but the charge for trash removal is halved to $450.00 on Deborah Schaefer's testimony that she disposed of The Green Giraffe's cartons. The plaintiff's total allowable damages are therefore $8,588.55.[4]
 III.
The court agrees with the defendants that the evidence and facts of this case support the inference that the premises were indeed rented on a square footage basis. For the first year of the lease the price was $13.00 per square foot, for the second year $13.65 per square foot and for the third year $14.33 per square foot. Based on the actual dimension of 1605 square feet in the leased premises, the defendants' rent for the first year (July 1, 1992 — June 30, 1993) should have been $20,865.00, for the second year (July 1, 1993 — June 30, 1994) $21,905.25 and for the portion of the third year (July 1, 1994 — June 30, 1995) that the defendants occupied the premises, namely July 1, 1994 — February 28, 1995, $11,499.78. Overpayments in rent by the defendants in the first year amount to $2,535,00; in the second year $2,665.00 and in the third year $1,865.92. The defendants compensatory CT Page 5814 damages are $7,065.92.[5]
Moreover, the plaintiff's apparent practice is to have its leases overstate the amount of square footage for rental properties. In the analogous situation of a deed describing land conveyed, the terms "about" and "more or less" are considered to be words of safety or precaution intended to cover some slight or unimportant inaccuracy. Ferrigno v. Odell, 113 Conn. 420, 425
(1931); Russo v. Corideo, 102 Conn. 663, 673 (1925). A misstatement that relates to almost 8% of the area leased is not protected by the words "about", "approximately" or "more or less". The effect of the misstatement was that the defendants were overcharged for the property they had rented.
The court agrees with the defendant's contention that the misstatement of square footage in the lease, in light of the similar experiences of other tenants, constitutes a violation of CUTPA being a deceptive act performed in the plaintiff's business of leasing real estate. General Statutes § 42-110a(4); 42-110b(a). In determining whether a CUTPA violation has occurred, Connecticut courts have adopted the "cigarette rule" promulgated by the Federal Trade Commission. A practice is unfair or deceptive when (1) it offends public policy as it has been established by statute, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) when it is immoral, unethical, oppressive or unscrupulous; (3) when it causes substantial injury to consumers [competitors or other businessmen].Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239
(1987). It is not necessary to satisfy all three criteria to support a finding of unfairness. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id. at 242. In the instant case, the court finds that all three aspects of the "cigarette rule" are present.
As recipients of a CUTPA violation, the defendants are entitled to punitive damages and an attorney's fee. General Statutes § 42-110g(a) (d); Hinchliffe v. American MotorsCorporation, 184 Conn. 607, 617 (1981). Under CUTPA, punitive damages are not limited, as at common law, to costs of litigation and attorney's fees but may be awarded at the court's discretion on a theory of deterrence, Lenz v. CNA Assurance Co., 42 Conn. Sup. 514,515 (1993). CT Page 5815
The court, as requested, awards the defendants $6,579.60 for an attorney's fees. On a theory of deterrence, the sum of $3,000.00 is awarded as punitive damages.
 IV.
In summary, judgment is rendered for the plaintiff on its complaint in the amount of $8,588.55. On the defendants' counterclaim the sums are $7,065.92 in compensatory damages, $6,579.60 for an attorney's fee, $3,000.00 in punitive damages and $3,900.00 for the return of the security deposit for a total of $20,545.52. A return of the security deposit is ordered because when the judgments are set off against each other, the defendants will not owe any rent and, as mentioned previously, there was no admissible evidence to establish the expense of repairing the premises.
The judgments are set-off against each other so that the defendants are the "prevailing party" in the sum of $11,956.97. As the prevailing party, the defendants are also entitled to taxable costs.
Jerrold H. Barnett, Judge