TRIANGLE SHEET METAL WORKS, INC., ET AL.
*v.* JACOB M. SILVER ET AL.

KING, C. J., MURPHY, ALCORN, HOUSE and THIM, JS.

Argued June 9—decided July 26, 1966

*Milton Sorokin,* with whom were *Joseph D. Hurwitz,* and, on the brief, *Ethel S. Sorokin,* for the appellants (defendants).

*Irving S. Ribicoff,* with whom was *Louise H. Hunt,* for the appellees (plaintiffs).

ALCORN, J. The named plaintiff, which we shall call Triangle, is a corporation which has been

engaged in sheet metal work since 1917. Sometime prior to 1960, it began to make and install metal structures to be used to enclose heating and/or air-conditioning units around the perimeter of buildings. The structures are commonly called enclosures.

The other plaintiff, Modulaire Components Corporation, hereinafter called Modulaire, is a corporation which was organized by Triangle in February, 1962, to handle the sale and installation of Triangle's enclosures.

The defendant Leonard R. Phillips is an engineer of wide experience in sheet metal work who was employed by Triangle from July 15, 1960, to June 19, 1963, as a heating, air-conditioning and ventilating engineer, and, when Modulaire was organized, he served as its vice-president from February, 1962, to June, 1963.

The defendant Renzel L. Byus was employed as a salesman by Triangle from January to December, 1962, and as a salesman for Modulaire from December, 1962, to March, 1963, when he became sales manager of Modulaire and continued in that capacity until October, 1963.

The other individual defendants are persons who joined with Phillips, after he left Triangle and Modulaire, to form the defendant corporation, Phillips Air Devices, Inc., in August, 1963, hereinafter called Air Devices.

Triangle and Modulaire brought this action, claiming that Phillips, in violation of his express agreement with the plaintiffs and in violation of his confidential and fiduciary relation with them, disclosed to Air Devices and the defendants who joined him in forming that corporation secret and confidential information concerning the plaintiffs'

business which those defendants proposed to use to the plaintiffs' disadvantage; that Phillips and those defendants conspired to appropriate, unlawfully, the plaintiffs' secret and confidential improvements and advances on their enclosures; that Phillips and those defendants induced Byus to leave the plaintiffs and join Air Devices and that he, in concert with the others, is using confidential information which he obtained while he was in the plaintiffs' employ to their damage; and that, in soliciting competing business, the defendants have wilfully and fraudulently misrepresented Air Devices' product and operations in an improper attempt to interfere with the plaintiffs' business.

The plaintiffs sought injunctive relief to restrain the actions complained of, as well as damages, reasonable attorneys' fees, and any other appropriate equitable relief. The trial court found in the defendants' favor on the conspiracy issue but rendered judgment for the plaintiffs on the other three counts. It enjoined Phillips, Byus, Air Devices and their officers, servants, agents and employees from certain specified activities until August 29, 1965, and awarded the plaintiffs exemplary damages in the form of $12,500 attorneys' fees.

At the start of the trial, the plaintiffs filed, over the defendants' objection, a substituted complaint which included a claim for reasonable attorneys' fees which had not been included in the original complaint. There is no dispute that, by it, the plaintiffs sought to recover exemplary damages. A motion to expunge the claim on the ground that the parties had agreed that no new issue was to be injected by the substituted complaint was denied by the court, and that denial is made one ground of appeal. The award of exemplary damages is a

major issue on the appeal, however, and we shall deal with it on a substantive basis as the parties have done rather than from the procedural aspect of the ruling on the motion.

The defendants have made a massive attack on the finding, much of which has been abandoned, but an examination of the still substantial portions which are pursued discloses that no corrections which would be of advantage to the defendants can be made.

The enclosures produced by Triangle in 1960 were mainly assembled and welded at the factory. This procedure necessitated the transportation of heavy and bulky units to the jobsite and resulted in a lack of flexibility in installation and adjustment to job conditions. These enclosures had no secret features which were novel to the trade. Triangle's president wished, however, to develop methods of fabricating enclosures with standardized parts and contacted Phillips pursuant to that objective. Following the discussion, Phillips was engaged to develop such a line of products for Triangle under a written contract, which provided that all matters concerning the development, improvement, advancement and extension of methods, processes, designs, plans, ideas and inventions were to be deemed trade secrets and to be held confidential and secret by Phillips and not disclosed by him during or after his employment and that any disclosure by Phillips would entitle Triangle to injunctive relief. The pertinent provisions appear in the footnote.[1]

---

[1] "5. All methods, processes, designs, plans and formulations and all items, products, tools, devices and equipment, or improvements, extensions or advancements, and all novel or original ideas and inventions pertaining or related to the fields of work above specified or our business or arising out of or connected with the work done by you or under your supervision or direction or your

After extensive experimentation during the first quarter of 1961, Phillips designed what is called the Modulaire enclosure. This was a new type of enclosure, distinguished by a series of interchangeable parts, which could be sent unassembled to the field for easy installation on the job and for easy adjustment to irregularities of job conditions. The

participation, or otherwise, shall, at all times during and after your employment by us, irrespective of whether the termination of your employment is voluntary or involuntary, and with or without cause, be and remain our exclusive property, and you shall have no rights thereto or interest therein.

"6. As the development, improvement, advancement and extension of methods, processes, designs, plans, formulations, items, products, tools, devices and equipment and ideas and inventions are essential to the future of our business, and because of the competitive nature of our business and our reliance and confidence in you, you agree that all such matters are confidential and the same and any information relating thereto, acquired by you in the course of your services for us, shall be deemed trade secrets and held confidential and secret by you and not disclosed by you, whether during or after your employment by us and irrespective of whether the termination of your employment is voluntary or involuntary, and with or without cause, and you shall not disclose the same to any other person, firm or corporation, whether a competitor of ours or engaged in a business similar to ours. You also agree not to disclose any such matters or information relating thereto, to any of our employees, other than our executive officers, except that you may make such limited disclosure to any such employee as may be necessary for the performance by him of his services in connection with his participation in the work of our Special Projects Division. You further agree that disclosure by you of such trade secrets, except to the extent hereinbefore permitted, may result in irreparable injury and damage to us which will not be compensable in money damages, and that we will have no adequate remedy at law, and that we may obtain such preliminary, temporary or permanent mandatory or restraining injunction, orders or decrees as may be necessary to protect us against, or on account of, any breach by you of the provisions of this paragraph. You further agree that upon termination of your employment by us, whether with or without cause, you will notify any new employer, partner, associate or any other person, firm or corporation with whom you become associated in any capacity whatsoever, of the provisions of this paragraph, and that we may give similar notice thereof."

design was unique, not known or used by others, secret and entitled to protection. It permitted Triangle to develop and adopt techniques for mass production. On October 17, 1961, Phillips applied for a patent on the Modulaire enclosure and assigned the patent application to Triangle. Triangle spent more than a year, and over a half million dollars, in solving problems of tooling and manufacturing, cost analysis, packaging, installation methods and price lists for the new enclosure, and production was commenced in March or April, 1962. Phillips was in general charge of the program and had full knowledge of all of Triangle's methods of design, as well as its practices concerning manufacturing, costs, pricing and bidding.

Byus, who, as already stated, was employed by both Triangle and Modulaire, had acquired full knowledge of the plaintiffs' costs, pricing, discounting and bidding procedures. As sales manager for Modulaire, he kept a record of Modulaire's standard pricing methods and another record of prospective jobs known to Modulaire. After he left Modulaire, the latter record could not be found.

On June 19, 1963, Phillips resigned from both Triangle and Modulaire, expressing dissatisfaction with his status in the two companies. On that date he agreed in writing that the improvements, advances and extensions on the enclosure designs on which he had been working belonged to Triangle; that he would sign, and assign to Triangle, all applications for patents on those items and cooperate in prosecuting them at Triangle's expense; and that, in consideration of a general release given by Triangle and Modulaire, he would not thereafter dislose any of their trade secrets.

When he left the plaintiffs, Phillips was negotiat-

ing with the defendants Jacob M. Silver, Emanuel M. Silver and Phillip Klein to start a manufacturing business, and, on or about August 7, 1963, they caused Air Devices to be incorporated. Soon thereafter, those defendants decided to produce enclosures without investigating whether, by that course, Phillips would violate his obligations to the plaintiffs or whether the enclosures they proposed to produce differed from the Modulaire enclosure. Phillips designed an enclosure for Air Devices which was an attempted modification of the Modulaire enclosure but contained features proprietary to, and not substantially different from, Modulaire. Knowledge of Triangle's production and design secrets were necessary in order to produce the essential features of this enclosure. The defendants actually produced no enclosures but were prepared to make them based on and using the Modulaire idea and the plaintiffs' secrets of design and production.

On October 12, 1963, Byus left his employment with Modulaire and on October 14, 1963, went to work for Air Devices. He immediately began to bid on projects for Air Devices which he had previously bid on for Modulaire, or with which he had become familiar while he was employed by Modulaire. On some of these projects, Phillips had been instrumental in having the architect incorporate specifications for Modulaire enclosures or features in the plans. At the time of the trial, however, Air Devices had succeeded in obtaining only two small contracts to supply enclosures.

The defendants produced and circulated a brochure to prospective purchasers which is substantially a copy of the plaintiffs' brochure and which bears a distorted copy of the plaintiffs' union label

although the defendants had neither a union contract nor the right to use the plaintiffs' union label. They solicited work from contractors with whom Triangle had also bid, representing, in substance, that Phillips had left the plaintiffs and joined Air Devices, which was staffed by former key personnel of Modulaire and which had developed a new, different and improved enclosure design. They bid on ten construction projects, using secret and confidential bidding data developed by the plaintiffs, and, after September, 1963, Modulaire lost eight of its sales representatives, some of whom became selling agents for Air Devices.

The Modulaire enclosure was unique, and its methods of design, tooling, manufacture and installation were trade secrets and confidential material belonging to Triangle and unknown to its competitors and of which Phillips had complete knowledge. Phillips disclosed to Air Devices and to the other defendants the secret and confidential information concerning the plaintiffs' business in violation of his agreement and of his confidential relationship with the plaintiffs, and the defendants have appropriated these trade secrets and confidential information. Phillips, Byus and Air Devices wilfully used confidential information concerning the plaintiffs' price list and bidding procedures and wilfully and deliberately misrepresented to actual and potential customers that Air Devices' proposed product was an improved Modulaire enclosure.

The court concluded that the plaintiffs were severely damaged as a result of the defendants' actions but that they had failed to prove their monetary damages with sufficient particularity. It concluded, however, that the plaintiffs were entitled to injunctive relief in certain particulars. The

injunction which was granted, however, expired by its terms on August 29, 1965. The court also concluded that the plaintiffs were entitled to exemplary or punitive damages on the third and fourth counts of the complaint and awarded the plaintiffs the reasonable value of the services of their attorneys which was found to be $12,500. The basis on which these damages were computed is not disputed, the issue being only as to whether the plaintiffs were entitled to any judgment for exemplary or punitive damages. The defendants have appealed, claiming that the court erred both in granting injunctive relief and in awarding punitive damages.

It is apparent from the facts which have been related that the foundation of the plaintiffs' case is that Phillips, by a breach of his express contract, and Byus, by a violation of the confidential relationship implicit in his employment by the plaintiffs, have, after the termination of their employment, utilized, in collaboration with the other defendants, confidential information acquired while they were in the plaintiffs' employ in order to compete with the plaintiffs. The basic principles applicable to the case are so clearly set forth, with supporting authority, in *Town & Country House & Homes Service, Inc.* v. *Evans,* 150 Conn. 314, 189 A.2d 390, as to require no detailed repetition here. Both Phillips and Byus, from the very fact of entering into employment with the plaintiffs, obligated themselves "to exercise the utmost good faith, loyalty and honesty toward . . . [their] principal or employer". Id., 317. And, regardless of the existence of any express agreement touching the subject such as Phillips had made, they could not use a trade secret acquired in the course of their

employment for their own benefit to the detriment of the plaintiffs. Id., 319; *Allen Mfg. Co.* v. *Loika,* 145 Conn. 509, 514, 144 A.2d 306.

The trade secrets involved in the present case fall roughly into two classes, namely, the design of the Modulaire enclosure with its manufacturing and installation procedures, and the financial details of its costs, pricing and bidding. The court found that both classes were fully known to Phillips and that the second was known to Byus. That the items in the first class are trade secrets which Phillips was bound not to disclose is clearly established as between him and the plaintiffs by his own express agreements with them. Those in the second class fully meet the definition of trade secrets set forth in *Town & Country House & Home Service, Inc.* v. *Evans,* supra, 318, so that neither Phillips nor Byus was privileged to disclose them. The trial court concluded that Phillips and Byus did disclose them and granted injunctive relief against Phillips, Byus and Air Devices. This action was proper. Since the particular restrictions imposed by the injunction have long since terminated, it is unnecessary, as this case is presented, to consider the defendants' attack on the scope of the injunction.[2] *Eastern*

---

[2] After enjoining Phillips, Air Devices and Byus generally from designing, manufacturing or selling an enclosure embodying certain specified features or performing certain described contracts, the court in its decree required them "to report promptly to the court the names and locations of, and to submit all drawings and specifications for the enclosures for any jobs that they bid on or that they contract to manufacture enclosures for during the period from June 4, 1964, to August 29, 1965, for the purpose of determining whether the enclosure structure complies with the terms of this decree and shall at the same time as each report is filed, advise plaintiffs' attorneys that such report has been filed." No issue of a violation of this injunction is raised in this case, nor is there any suggestion of a noncompliance with it.

*Electric Construction Co.* v. *Morrissey,* 142 Conn. 742, 743, 115 A.2d 427.

There remains for consideration the correctness of the court's action in awarding punitive or exemplary damages in the form of attorneys' fees. As in the case of the injunctive relief, this portion of the judgment is only against Phillips, Byus and Air Devices.

The basis for the award of damages is, as in the equity phase of the case, the breach by Phillips and Byus of their contract obligations, express or implied. Punitive damages are not ordinarily recoverable for breach of contract. Restatement, 1 Contracts § 342; 5 Corbin, Contracts § 1077; McCormick, Damages § 81. This is so because, as lucidly reasoned by Professor Corbin in the passage cited, punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship. The few classes of cases in which such damages have been allowed contain elements which bring them within the field of tort. It is, of course, settled law that, in certain cases of tort, punitive or exemplary damages may properly be awarded. In Connecticut, however, recovery is limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs. *Vogel* v. *Sylvester,* 148 Conn. 666, 673, 174 A.2d 122. We have said that punitive damages are allowable in a libel action where malice is established; *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557, 571, 72 A.2d 820; in a wanton and malicious assault and battery; *Shupack* v. *Gordon,* 79 Conn. 298, 303, 64 A. 740; *Maisenbacker* v. *Society Concordia,* 71 Conn. 369, 378, 42 A. 67; and where a wanton and

wilful injury is proved. *Linsley* v. *Bushnell,* 15 Conn. 225, 236; see also *Beecher* v. *Derby Bridge & Ferry Co.,* 24 Conn. 491, 497.

The court concluded that the defendants' conduct was wilful, as indeed it had to be if they were to embark on a program of competition with the plaintiffs. Neither the third nor the fourth count of the substituted complaint, under which punitive damages were awarded, contains, however, any allegation of a motivating intent or design, actual or constructive, on the part of the defendants to harm the plaintiffs by their conduct. *Sharkey* v. *Skilton,* 83 Conn. 503, 507, 77 A. 950. Furthermore, the record does not disclose the existence of that "malicious or wanton misconduct" which would justify an award of exemplary or punitive damages. *Welch* v. *Durand,* 36 Conn. 182, 185; *Burr* v. *Plymouth,* 48 Conn. 460, 473.

The flavor of the basic requirement to justify an award of punitive or exemplary damages has been repeatedly described in terms of wanton and malicious injury, evil motive and violence. *Milwaukee & St. P. Ry. Co.* v. *Arms,* 91 U.S. 489, 493, 23 L. Ed. 374; *Denver & R. G. Ry.* v. *Harris,* 122 U.S. 597, 610, 7 S. Ct. 1286, 30 L. Ed. 1146; *Lake Shore & M. S. Ry. Co.* v. *Prentice,* 147 U.S. 101, 107, 13 S. Ct. 261, 37 L. Ed. 97; *Fay* v. *Parker,* 53 N.H. 342. The Restatement declares that punitive damages may be awarded only for "outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others." Restatement, 4 Torts § 908, comment (b).

On the record, the court erred in awarding punitive or exemplary damages.

There is error only as to the portion of the judgment awarding punitive damages, the judgment is

set aside and the case is remanded with direction to render judgment as on file except for the award of damages.

In this opinion KING, C. J., HOUSE and THIM, Js., concurred.

MURPHY, J. (concurring in the result). As the allegations in the complaint do not state a cause of action entitling the plaintiffs to punitive damages, I agree in the result stated in the opinion so far as it is based on that deficiency. *Stavnezer* v. *Sage-Allen & Co.,* 146 Conn. 460, 461, 152 A.2d 312.