[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a hearing in damages in an action brought by the CT Page 10844 Plaintiff home owner, Virginia Riggio against Orkin Exterminating Co., Inc. (Orkin). The complaint is in four counts: Count one, Breach of Contract; Count two, Breach of Contract, Warrantee and Guarantee; Count three, negligence; Count four, The Connecticut Uniform Trade Practices Act (CUTPA). The defendant was defaulted. Accordingly all of the allegations of the four counts are deemed admitted. These include the defendant's admission that the plaintiff has lost the use and enjoyment of her home and that the defendant's acts, omissions, misrepresentation and conduct with the plaintiff constitute unfair and deceptive trade and business practice in violation of CGS § 42-110a, the Connecticut Unfair Trade Practice Act (CUTPA). As well, the defendant has admitted that the plaintiff has incurred and will incur substantial expenses to repair her property.
The facts are as follows. The plaintiff and her family have lived in the house which is the subject of this action for 25 years. She has been a day care provider for 15 years, providing day care in her home. In October of 1993 when the sill in the dining room was removed crawling bugs were found inside the window. The plaintiff found the Orkin add in the yellow pages of the telephone book saying Orkin guaranteed its work. She called and a representative from Orkin came to the house. The plaintiff was given the Orkin brochure which the representative reviewed with her. The representative told her there were termites, told her about the ones that eat wood, told her about swarms and also told her about tunnels. The representative explained that he would come the first time to inspect the area and that if Orkin was to do the work, what it would involve. The plaintiff was told that a protective barrier would be laid outside of the house to keep termites out and that in turn the termites in her home would die from lack of moisture. The plaintiff was told one treatment would do the job; that there would be no problems after the first treatment. Orkin offered a warranty that if any termites turned up, Orkin would come out any time within the first two years. The plaintiff was also told about an extended warranty plan which would cover her from any reinfestations in the future, which plaintiff purchased as well.
On October 26, 1993, Orkin applied the treatment. Before that, the plaintiff had prepared the house for them. The entire flooring of the cellar was removed as well as the backboard moulding. Orkin had to drill through the flooring. Within four months of the October 26th treatment visual signs of termites appeared. Orkin returned seven times in 1994 over several months CT Page 10845 and retreated the areas of the termite sightings. In April of 1995, on Easter, the family experienced a termite swarm. Hundreds totally covered the dining room window. Orkin took off the sill and sheet rock below and found live termites under the window. Orkin hired J.J. Sullivan to repair the dining room window.
On another occasion the day care children were covered by swarming termites as the children slept. They came up from the kitchen and family room floor. Termites had eaten the area underneath the kitchen and family room. J.J. Sullivan was hired by Orkin to reinforce the floor joints.
In July of 1995 more active termites were sighted. Orkin came and patched and treated. Orkin was back twice in August of 1995. Again in September of 1995 more treatment was required. In December of 1995 active termites were found behind the tile in the bathroom on the main floor. Tile had begun to fall from the walls. Orkin did not come out this time but told the plaintiff to get estimates.
At the time that termites surfaced in the bathroom, the basement had visible blistering of the sheet rock and termites were coming through. The bathroom had to be gutted.
Contractors working in the bathroom were standing in termites. The tile, flooring and fixtures all had to be removed and replaced. Meetings took place with Orkin's branch manager about putting the bathroom together again. J.J. Sullivan provided estimates. The bathroom was left partially repaired. A bill of $11,000 remains unpaid.
The basement had been made into a bedroom for plaintiff's son. It had sheet rock on the walls, a mural with a jungle scene, a wood stove on a hearth, shelving for books, clothing built ins and a finished ceiling. The sheet rock was insulated and there was new molding. Termites were in the walk-in closet and had eaten though boxes of collectibles. The damage was so extensive that the plaintiff had to get Orkin and its branch manager back. In July and August of 1996 meetings took place. Orkin directed that cuttings take place in various parts of the basement. After those cuttings termites were discovered everywhere. Plaintiff was told to continue to gut the basement. J.J. Sullivan did this. All walls, ceilings, wall studs, carpets and tile were removed. What stands now is a concrete basement with no wall cover or insulation. The basement has been like this since 1996. CT Page 10846
In January of 1995 Orkin on its own gave the plaintiff a one year free renewal of its service contract. The reason written on the form by the branch manager was "have had several retreats done, due to an improper treatment on initial service."
Orkin was called back to the plaintiff's property on September 5th, 9th and 16th of 1996, each time applying treatment, and again in August 1997 and September 1997 termites came out and were treated by Orkin. In March of 1998 termites swarmed the basement area. At that time Orkin only came to inspect.
In the last 4 1/2 years Orkin came out 27 times to treat. The affect on the daily living of plaintiff's family of seven has been to leave them with only the upstairs bathroom which has a shower and no tub. The main bathroom on the first floor stands unfinished. The finished basement which had been initially a family room and then a bedroom is gone. Two of the children used to be able to sleep there. The cellar has no insulation and no heat.
Plaintiff's expert Paul Sullivan of J.J. Sullivan is the contractor who was initially brought in by Orkin to repair the dining room window following the first swarm of termites in April 1995. Before this there had been seven treatments by Orkin due to termite sightings in other areas of the house. J.J. Sullivan continued to be called back as other problems developed in other parts of the house i.e., in the bathroom, the basement and the kitchen. The Orkins' expert was Jeffrey Hamm a property-damage adjuster and former contractor. Hamm inspected the plaintiff's basement with the assistance of an engineer hired by Orkin, James Grant. Hamm followed Grant around the basement. Hamm stated Grant probed with a screw driver to see how solid the wood was. Hamm and Grant went up to the first floor probing in the kitchen, family room, foyer and bathroom. Some movement was detected in the tile floor in the kitchen and dining room. The probing continued for soft wood on the outside of the house. The sill plate under the house was similarly probed but no testimony was offered by Hamm as to the result of that probing. Hamm repeatedly stated in the course of his testimony that he was not a termite expert and could not identify termite damage. He took those areas identified by Grant and made a computer run to determine what it would cost to make repairs to those areas. The computer program used by Hamm drew its numbers from costs manuals CT Page 10847 used nationwide by contractors and others in the building trade. These prices were adjusted by Hamm for higher prices in the northeast. He also added 10% for contractor's overhead. 10% for contractor's profit and another six percent for sales tax. Hamm came up with a total figure of $31,935.61 covering the following repairs:
 1. Garage: Replace three two-by-four "Jack Studs" on the side of the door opening. $340.00.
 2. Bathroom: Remove and reinstall the fixtures, replace tile floor, wall framing, insulation, sheetrock and tile, painting, wallpapering. $2,329.86.
 3. Basement: Replace carpet and carpet pad at cost of $24.48 per square foot. Replace wallpaper, $512.28. Replace the small beam beneath the foyer which consists of three two-by-eight pieces of lumber, $72.33.
 Replace the sill plate — the block of wood at the top of the foundation. Attach new blocks to existing rim joints. Install aluminum flashing between the sill plate and foundation, extending underneath the skirt boards. Unspecified miscellaneous work. $2,289.50.
 4. Kitchen: Replace 50% of subflooring. Replace ceramic floor tile. Replace some framing, sheetrock and molding. Remove and replace cabinets, stove and refrigerator. $3,187.43.
 5. The Foyer: Replace ceramic floor, subflooring, various paint and trim work. $1,135.10.
 6. Family Room: Replace sheetrock, wallpaper, molding and repair door casing. $1,066.70.
Paul Sullivan's inspection of the premise found termite mud trails going up the basement walls horizontally, as well as termite mud trails surrounding the perimeter of the house. He found termite damage to the sill of the house, the rim board of the house, the main carrying beam, the carrying beam under the front foyer, floor joints, and termite damage to the structure underneath the kitchen/family room floor. He found a depression of the floor in the kitchen/family area. He found termite damage CT Page 10848 on the hardwood flooring of the closet area of the vestibule. He found termite damage to the header in the garage. Sullivan concluded that the structural integrity of the house had been compromised due to termite damage. He observed termite mud trails around the entire outside and inside perimeter of the foundation of the house. He concluded that access to the entire sill plate; i.e. the structural framing member attached by bolts to the concrete foundation, was necessary.
Paul Sullivan's basement repairs total $30,756.04 and include a carpet figure of $6,912.28 together with a wallpaper mural of $1,738.50. Repairs to the front vestibule are priced at $5,486.48. Kitchen repairs are priced at $4,976.71. The family room repairs are priced at $8,208.83. Exterior house repairs total $81,536.89 and include $60,647.00 to install exterior siding. Garage repairs total $8,207.72. The bathroom repairs already done but not paid for total $11,000. These repairs total $150,172.67.
The difference in figures advanced by the defendant's expert and the plaintiff's expert is that the defendant approaches the problem as it has over the past four years, that is in piece meal fashion. There is no question that this house went from a limited infestation area as evidenced by the diagram Orkin made when they were first called to the house. By Orkin's own admission their treatment on initial service was improper. The barrier that was supposed to keep termites out and cause the death of those within wasn't there. The infestation grew and spread eventually encompassing the whole house. Twenty-seven spot treatments were totally ineffective to stop the spread. Orkin's articulated position that they are only responsible for damage they can see is what has resulted in this expert's damage figure being so far below that of the plaintiff's expert. Both experts point to the absence of a shield around the foundation of the house which absence gives termites access to the house's exterior siding. Because siding was not removed to check behind it the defendant claims it is pure speculation to say the exterior siding has been compromised. We do not agree. There are mud trails around the exterior foundation. The sill on which the house sits has termites. There is no shield to keep them from traveling up behind the siding.
Orkin's own experience has been that they have never had to go out as many times to a site as they have to this one to keep spot retreating. Because the initial treatment was not properly CT Page 10849 done subsequent spot retreatments were not effective. Orkin should have seen that early on and undertaken a more comprehensive approach to resolving a problem which did nothing but escalate over the years, causing the plaintiff and her family more and more disruption and discomfort and significant damage to the property.
"A default in an action for legal and equitable relief admits the material facts constituting a cause of action. Cardona v.Valentin, 160 Conn. 18, 26, 273 A.2d 697 (1970)." Kloter v.Carabetta Enterprises Inc., 186 Conn. 460, 464, 442 A.2d 63
(1982). "Upon default, the plaintiff ordinarily becomes entitled to recover nominal damages. The right to further substantial damages remains to be established by the plaintiff at a hearing in damages. New York, N. H. and H.R. Co. v. Hungerford,75 Conn. 76, 78, 52 A. 487 (1902)." Id. 464.
"The burden of proving damages is on the party claiming them." Gargano v. Heyman, 203 Conn. 616, 620, 525 A.2d 1343
(1987). "Damages are recoverable only to the extent that the evidence offers a sufficient basis for estimating their amount in money with reasonable certainty." Humphreys v. Beach, 149 conn. 14, 21, 175 A.2d 363 (1961).
"The party seeking recovery has the burden of proving by a fair preponderance of evidence the amount of his damages. (Citations omitted). The court must have evidence by which it can calculate the damages which is not merely subjective or speculative, but which allows for some objective ascertainment of the amount. (Citations omitted)." Bronson Townsend Co. v.Battistoni, 167 Conn. 321, 326-27, 355 A.2d 299 (1974).
Even though the liability claims are deemed admitted the plaintiff must still prove her damages by a preponderance of the evidence; that is, she must prove that the damages claimed were caused by the defendant. It is undisputed that Orkin applied its treatment improperly with the result that the termites which were to have died because of being trapped within the barrier which the treatment was to have created did not die but instead multiplied and spread.
The spread of termites was not due to new infestations but rather to the original more localized ones which because of the improper treatment were not killed and thus spread to other parts of the house. Every 1st floor room is now infested and the CT Page 10850 basement is totally infested. Orkin's unwillingness to recognize that more needed to be done right after it became obvious that the treatment contracted for had failed resulted in half measures which left the property no protection from the movement of these termites to other parts of the house and garage.
The condition of the property is such that heroic measures have to be taken to find and repair the existing termite damage. This is damage not always visible to the naked eye. Orkin cannot prevail on its contention that it is not responsible for any damage it cannot see. Termites eat wood from the inside out and therefore a piece of wood that appears normal could be damaged internally. When the south side window was replaced siding had to be removed to get at the termites found in and around the window sill and frame.
This court found more credible the testimony of plaintiff's expert Paul Sullivan. He has worked on the property almost continuously since 1994. He has seen the infestation spread. At one time or another he has worked on the basement, bathroom, kitchen, family room and foyer. He has also viewed the garage. He knows what termites look like and knows what kind of damage they cause. The defendant's expert admitted he did not know what termites looked like. His role was to focus on what it would cost to repair spots identified by the defendant's engineer when that engineer did a walk through, probing with a screw driver but not looking behind.
Paul Sullivan's figure of $150,172.67 includes $30,756.04 to restructure the basement into living space. The basement had to be gutted to its bare cement walls and rafters to expose the termites. It allows for residing the house and the garage. It also includes bathroom fixtures all of which were sitting in live termites. It was reasonable to replace those fixtures.
The court must determine on a figure which will put the plaintiff where she would have been had the service been performed properly. She would have had a termite free older home with a fixed up basement. An award of one hundred thousand dollars will in this court's opinion enable the plaintiff to ensure she is rid of termites before she goes forward and makes needed repairs. We are persuaded that removal of the siding is necessary. Once removed it needs to be replaced.
Finally we address the CUTPA claim. The plaintiff seeks an CT Page 10851 award of punitive damages under CUTPA. The default as to the CUTPA claim establishes that the plaintiff is entitled to nominal damages under CUTPA but the default does not establish that the plaintiff deserves punitive damages or attorney fees. "`In order to award punitive or exemplary damages, evidence must reveal a reckless indifferent to the rights of others or an intentional and wanton violation of those rights. Collins v. New Canaan WaterCo., 155 Conn. 477, 489, 234 A.2d 825 (1967). In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence. Triangle Sheet Metal works, Inc. v. Silver,154 Conn. 116, 128, 222 A.2d 220 (1966)' Venturi v. Savitt, Inc., 191 conn. 588, 592, 468 A.2d 933 (1983)." Gargano v. Heyman,203 Conn. 616, 622, 525 A.2d 1343 (1987).
On the facts found it is evident that Orkin did not ignore plaintiff's calls, returning 27 times over a four and one-half year period. Its piecemeal approach was unsuccessful in eliminating the problem which kept escalating rather than abating. However, on the issue of punitive damages this court does not find that Orkin acted with reckless indifference to the plaintiff's rights or that Orkin intentionally violated her rights.
Clearly, representations were made which were the basis on which the plaintiff purchased the service, which service did not produce the results guaranteed. After a point Orkin stopped trying to rectify the termite problem. The plaintiff's only recourse was to initiate the instant action. She did so, entering into a contingent fee arrangement with her attorney. Under the provisions of C.G.S. § 42-110q(d) the court may award, to the plaintiff reasonable attorneys fees based on the work reasonably performed by an attorney. The awarding of attorney fees is within the discretion of the trial court. Gargano v. Heyman,203 Conn. 616, 622, 521 A.2d 1343 (1987).
The defendant contends that in order for the plaintiff to recover attorney's fees pursuant to her CUTPA claim, she was required to put on evidence through which the court could determine the proper amount of such a fee pursuant to the guidelines propounded in Steiger v. J.S. Builders,39 Conn. App. 32, 38-39, 663 A.2d 432
(1995). In Steiger, the Appellate Court adopted, for CUTPA purposes, the twelve guidelines stated in Johnson v. Georgia HighwayExpress, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). CT Page 10852 This court does not read Steiger to mandate an evidentiary hearing in all cases in which there is a CUTPA claim for attorney fees.
In determining whether the fees which would be generated under that arrangement should be allowed the court considers the legal questions presented, the skill required to present the case, the amount in controversy, the experience of the attorney, the case itself, and the time required to put the case together, to plead it, to try it and to prepare the pre-trial and post-trial briefs. This was a hearing to the court which ran three and one-half days, with expert testimony and extensive pre-trial and post-trial briefs. There were extensive pre-trial motions some of which involved preclusion issues as well as issues dealing with experts and site inspections. Based on the aforesaid considerations the court awards attorney fees in the amount of the 1/3 contingency fee arrangement entered into between the plaintiff and her attorney.
Judgment may enter for the plaintiff, Virginia Riggio, against the defendant, Orkin Exterminating Company, Inc., in the amount of one hundred thousand dollars ($100,000) together with attorney fees in the amount of the one-third (1/3) contingency fee agreement.
Hennessey, J.