**INDEPENDENCE INSURANCE
SERVICE CORPORATION,**
Plaintiff

v.

**HARTFORD LIFE INSURANCE
COMPANY, et. al.,**
Defendants.

Civil Action No. 3–04–CV–1512 (JCH).

United States District Court,
D. Connecticut.

Jan. 29, 2007.

Kurt F. Zimmermann, Nathan M. Silverstein, Leonard K. Atkinson, Jr., Silverstein & Osach, New Haven, CT, for Plaintiff.

James F. Jorden, Jorden Burt, Washington, DC, Amor Celeste Rosario, Michael A. Valerio, Christopher G. Barnes, Jeffrey L. Williams, Jorden Burt, Simsbury, CT, for Defendants.

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE [DOC. NOS. 74 & 81]**

HALL, District Judge.

The plaintiff, Independence Insurance Service Corporation ("IISC"), brings this action against the defendants, Hartford Life Insurance Company ("HLI") and Hartford Life and Accident Insurance Company ("HL & A") (collectively, "Hartford"). In their Second Amended Complaint [Doc. No. 47], the plaintiff alleges breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count III), and negligent misrepresentation (Count IV).

The defendants have filed a Motion for Summary Judgment [Doc. No. 74] on all of plaintiff's claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. They have also filed a Motion to Strike the Affidavit of Howard Rosenthal and Related Materials Submitted in Support of Plaintiff's Opposition to Motion for Summary Judgment [Doc. No. 81].

**I. STANDARD OF REVIEW**

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against

whom summary judgement is sought. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Graham*, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

## II. FACTS[1]

IISC is a wholly-owned subsidiary of Independence Long Term Care, Inc. and is involved in the marketing and administering of long-term care insurance products. *See* Def.'s Loc.R.Civ.P. 56(a)1 Statement ("Def.'s Stat.") at ¶¶ 1–2 [Doc. No. 75]. Howard Rosenthal is a director, officer, and the largest shareholder of IISC, and he is also its president. *Id.* at ¶ 5.

In the ten-year period prior to entering into a relationship with Hartford, IISC (and its predecessor company) had mailed approximately 855,000 solicitations and sold approximately 6,000 policies and/or certificates of insurance. *Id.* at ¶ 4. In November 1997, IISC and Hartford entered into an Administrative, Compensation and Claim Services Agreement ("Agreement"), under which IISC was to provide administrative services relating to a unique long-term care insurance policy ("Policy") that was to be underwritten by Hartford. *Id.* at ¶ 11, 13. As the Policy's Administrator, IISC was responsible for its marketing, sale, and distribution, using primarily contracted-third-party administrators ("TPAs") for the mailings and mar-

keting. *Id.* at ¶ 14; 20. The Agreement included language that Hartford agreed to use its "best efforts to qualify the Policies" in the states, but did not expressly guarantee approval in all states. *Id.* at ¶ 16–17; *see also* Plf.'s Stat. at ¶ 16 [Doc. No. 80].

In late 1997 or early 1998, Hartford held a conference for its sales force in Las Vegas where the Long Term Care Group, Inc. ("LTCG") was invited to present. IISC had become aware that LTCG would be presenting prior to this conference. *See* Def.'s Stat. at ¶ 30–31. Hartford entered into contracts with LTCG in early April 1998. *Id.* at ¶ 32. Additionally, in early 1998, a marketing proposal that related to the Policy was issued to the American Medical Association ("AMA"). *Id.* at ¶ 33.

The initial distribution of the Policy was limited in scope. *Id.* at ¶ 39. The Agreement did not prohibit IISC from pursuing any other markets for long-term care insurance other than association business, and IISC was able to continue any relationship it had with the Allmerica Group of companies regarding associated-marketed long-term care insurance. *Id.* at ¶ 42.

The Policy's marketing and sales process involved many steps. *Id.* at ¶ 43. If solicitation were authorized, IISC would need to negotiate the terms of a marketing agreement and the schedule for soliciting the membership of an association with the TPA. *Id.* at ¶ 46–47. IISC cannot identify any instance where Hartford denied a request by IISC for the issuance of a marketing proposal to any specific association. *Id.* at ¶ 59.

Around August 19, 1998, Hartford began filing the Policy for approval with all the state departments of insurance ("DOI"),

---

1. For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving plaintiff, where there is evidence to support its allegations.

but the "state has everything to do with" whether a policy was approved. *Id.* at ¶ 52–54. Within a year, thirty-four jurisdictions had granted approval. *Id.* at ¶ 55. Hartford received approval of the Policy in forty-six jurisdictions. *Id.* at ¶ 60. Hartford's approval rate was more than other carriers for which IISC (or its predecessor company) had marketed long-term care insurance products. *Id.* at ¶¶ 61–62.[2]

IISC never achieved its marketing goals set forth in the marketing plans with Hartford or with other long-term insurance carriers. *Id.* at ¶ 63. Only 29 of the 144 groups to which the parties issued proposals provided authorization to solicit at least some part of their membership. *Id.* at ¶ 64. Through April 1, 2004, 173,677 association members were actually solicited with the Policy, and IISC's total premium income from the Policy through May 31, 2006, was approximately $450,000. *Id.* at ¶¶ 113–14.

On June 14, 2001, Hartford informed IISC that it was evaluating its long-term care insurance business, and in October 2001 it notified IISC that it had decided to exit the business. *Id.* at ¶ 65–66. On November 16, 2001, Hartford announced to its division employees that the sale of its long-term care business was closed. *Id.* at ¶ 70. MedAmerica announced its acquisition of Hartford's long-term care business in April 2002, and Hartford introduced IISC representatives to MedAmerica representatives. *Id.* at ¶¶ 71–72.

Prior to October 24, 2001, IISC never notified Hartford of any alleged breach nor sought to terminate the Agreement as a result of any alleged breach on the part of Hartford. *Id.* at ¶ 69. IISC filed its origi-

nal complaint on September 10, 2004, and filed its Second Amended Complaint on June 27, 2005. *Id.* at ¶¶ 76–77. At his deposition, IISC's president, Mr. Rosenthal, testified that he understood or expected Hartford would begin the filing process by the middle of 1998, although IISC admits that there was no express language in the Agreement requiring Hartford to obtain state approvals by the spring of 1998. *Id.* at ¶ 79;[3] Plf.'s Stat. at ¶ 81. Mr. Rosenthal further testified that he believed there was a "lack of effort." *Id.* at ¶ 84. IISC's expert witnesses reviewed documents relating to IISC's damage claim for lost business and the associated "value" of IISC. *Id.* at ¶ 92.

## III. DISCUSSION

### A. Breach of Contract (Count I)

■ Defendants claim that IISC's breach of contract claim fails as a matter of law and because it is barred by the statute of limitations. Defendants' statute of limitations argument is based on their assumption that IISC's breach of contract claim accrued by the spring of 1998, when IISC allegedly expected Hartford to have obtained state approvals for the Policy. *See* Def.'s Memorandum in Support of their Motion for Summary Judgment ("Mem. in Supp.") at 25–26 [Doc. No. 76]. Both parties agree that the statute of limitations for a breach of a written contract in Connecticut is six years, *see* Conn. Gen. Stat. § 52–576(a), and thus Hartford argues that IISC should have brought this action no later than the spring of 2004. IISC filed its original complaint on September 10, 2004. IISC counters that its breach of contract claim is not based solely

---

**2.** In its Memorandum in Opposition to Defendants' Motion to Strike ("Mem. in Opp. to Mot. to Strike"), at 8 [Doc. No. 84], IISC withdrew its denial of paragraphs 61 and 62 of Hartford's 56(a)1 Statement.

**3.** IISC has withdrawn its denial of paragraph 79 of Hartford's 56(a)1 Statement. *See* Plf.'s Mem. in Opp. to Mot. to Strike, at 8.

on the failure to obtain state approvals; rather, it is based on a sequence of acts, such as alleged lapses of state approvals in 2002 and 2003. Therefore, its claim is not barred because the "continuing course of conduct" exception to the six-year statute of limitations applies. *See* Plf.'s Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Mem. in Opp.") at 25–28 [Doc. No. 79].

> As the Second Circuit has noted:
>
> Connecticut courts ... have recognized that where there is a continuing course of conduct constituting a breach of duty, the limitations period does not begin to run, or is tolled, until that conduct terminates. See *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 209, 541 A.2d 472, 474 (1988) (statute of limitations tolled); *Handler v. Remington Arms Co.*, 144 Conn. 316, 321, 130 A.2d 793, 795 (1957) (statute of limitations does not begin running).... See *Skidmore, Owings & Merrill v. Connecticut Gen. Life Ins. Co.*, 25 Conn.Supp. 76, 93, 197 A.2d 83, 91 (Conn.Super.Ct.1963) ("In considering the application of the Statute of Limitations to this case, one must distinguish between a contract obligation ... providing for a continuing, indivisible responsibility for the attainment of an end result, and a contract for the performing of a specific, definable act.").

*West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir.1990) (applying exception to breach of contract claim). The defendants argue that the continuing course of conduct exception does not apply to this action, and thus that the plaintiff's cause of action is time-barred.

The continuing course of conduct doctrine is "conspicuously fact-bound." *Blanchette v. Barrett*, 229 Conn. 256, 276, 640 A.2d 74 (1994). The Connecticut Supreme Court has applied it to cases where "there has been evidence of either a special rela-tionship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." *Giulietti v. Giulietti*, 65 Conn.App. 813, 784 A.2d 905, 925 (2001). While the Court has applied it primarily in the context of medical malpractice and other negligence cases, it has also stated that the existence of a contractual relationship alone is insufficient to establish a "special relationship." *See Fichera v. Mine Hill Corp.*, 207 Conn. 204, 210, 541 A.2d 472 (1988).

In this case, IISC has argued that there was no single, finite transaction between the parties and thus the continuing course of conduct exception applies. The court believes that it need not decide whether it does apply to this breach of contract claim, as it finds that there is an issue of material fact regarding whether Hartford's failure to obtain state approvals of the Policy by the spring of 1998 would constitute a material breach such that IISC's cause of action began to accrue.

> "Applied to a cause of action, the term to accrue means to arrive; to commence; to come into existence; to become a present enforceable demand." (Internal quotation marks omitted.) *D'Occhio v. Connecticut Real Estate Comm'n*, 189 Conn. 162, 182, 455 A.2d 833 (1983). "While the statute of limitations normally begins to run immediately upon the accrual of the cause of action, some difficulty may arise in determining when the cause or right of action is considered as having accrued. The true test is to establish the time when the plaintiff first could have successfully maintained an action." (Internal quotation marks omitted.) *Engelman v. Connecticut Gen. Life Ins. Co.*, 240 Conn. 287, 294 n. 7, 690 A.2d 882 (1997).

*Coelho v. ITT Hartford*, 251 Conn. 106, 111, 752 A.2d 1063 (1999). In terms of

actions for breach of contract, "the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted." *Kennedy v. Johns–Manville Sales Corp.*, 135 Conn. 176, 180, 62 A.2d 771 (1948). Moreover, "[w]hether there has been a material breach of a contract is a question of fact." *Alaimo v. Beacon Industries, Inc.*, 89 Conn.App. 363, 873 A.2d 1015, 1017 (2005).

IISC also appears to argue that Hartford "dropped the bomb" on October 24, 2001, when it informed IISC in a letter that it had decided to no longer participate in the Agreement. *See* Plf.'s Mem. in Opp. at 27. The court finds that the plaintiff has presented a genuine issue of material fact as to when its breach of contract claim accrued. Thus, the court denies defendants' motion for summary judgment on this claim.

### B. Breach of Covenant of Good Faith and Fair Dealing (Count II)

Defendants also argue that Count Two is barred by the statute of limitations, arguing that a three-year general tort statute of limitations is applicable to a claim for breach of implied covenant of good faith and fair dealing. IISC counters that, although the court need not decide the issue because the continuing course of conduct exception applies, the applicable statute of limitations for a breach of good faith claim is six years. Although the defendants cite a number of cases, including one from the Second Circuit, that have held that such claims sound in tort and are therefore governed by the three-year statute of limitations, *see* Def.'s Mem. in Supp. at 27, none of the cases cited are controlling on this court.

■ In a very recent decision, the Connecticut Appellate Court applied the six-year statute of limitations to a cause of action alleging breach of the implied cove-

nant of good faith and fair dealing. *See Bellemare v. Wachovia Mortgage Corp.*, 94 Conn.App. 593, 894 A.2d 335, 346 (2006). This holding was based on the Connecticut Supreme Court's recent pronouncement in *Collins v. Anthem Health Plans, Inc.*, 275 Conn. 309, 333, 880 A.2d 106 (2005) that such claims "sound[ ] in breach of contract ... [because] '[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.'" Thus, IISC's claim is subject to the six-year statute of limitations as provided in Conn. Gen.Stat. § 52–576(a). *See Bellemare*, 894 A.2d at 346.

■ The court need not now decide whether the continuing course of conduct exception also applies to the implied covenant of good faith and fair dealing, for the court finds that IISC has presented a genuine issue of fact as to whether Hartford engaged in bad faith within the six years prior to filing the complaint. " 'To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.'" *Collins*, 275 Conn. at 333–34, 880 A.2d 106 (citations omitted).

■ Although IISC has primarily (inadequately) countered Hartford's challenge by referring the court to the "acts and omissions which have been described throughout this memo," *see* Plf.'s Mem. in Opp. at 31, the court does find that IISC has presented some evidence that prevents the granting of summary judgment on this claim. As one example, IISC states that "Hartford was informing its compliance staff that the long term care initiative was over while at the same time it was telling IISC that the delays in the approvals were due to the purported complexity of the

Policy." *Id.; see* Plf.'s Stat. of Disputed Issues of Material Fact at ¶¶ 17, 19. IISC referred to several instances occurring within the six-year period before it filed its original complaint that create a genuine issue of material fact as to whether Hartford's decision to abandon the longterm care initiative was actually made unofficially much sooner than Hartford led IISC to believe. *See* Plf.'s Stat. of Disputed Issues of Material Fact at ¶ 17; Plf.'s Mem. in Opp. at 31. Thus, Hartford is not entitled to summary judgment on this claim.

### C. CUTPA (Count III)

■ Conn. Gen.Stat. § 42–110b(a) provides that, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). To determine whether a practice violates CUTPA, courts examine these factors: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Sanghavi v. Paul Revere Life Ins. Co.,* 214 Conn. 303, 311–312, 572 A.2d 307 (Conn.1990) (citations omitted). "[T]o be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an 'ascertainable loss' due to a CUTPA violation." *Collins v. Anthem Health Plans, Inc.,* 275 Conn. 309, 334–335, 880 A.2d 106 (2005).

■ Defendants argue that IISC's CUTPA claim fails on the merits and because it is also time barred. The appropriate statute of limitations for CUTPA claims is three years. *See* Conn. Gen.Stat. § 42–110g(f) (2006). This limitation period is "triggered upon the occurrence of the alleged violation, not the discovery of the alleged practice." *Izzarelli v. R.J. Reynolds Tobacco Co.,* 117 F.Supp.2d 167, 177 (D.Conn.2000). Connecticut courts have applied the continuing course of conduct doctrine to toll the CUTPA limitations period. *See id.* (citing *Blanchette,* 229 Conn. at 265, 640 A.2d 74).

■ In this case, for the CUTPA claim to fall within the three-year limitations period, IISC needs to provide evidence of deceptive practices, or a continuing course of deceptive conduct, by Hartford that occurred on or after September 10, 2001, which is when the statute of limitations on IISC's CUTPA claim began to run. The court finds that IISC cannot do so. If the court assumes that Hartford's decision to abandon the long-term care initiative was actually made much sooner than Hartford led IISC to believe constitutes a deceptive practice under CUTPA, then IISC has provided no evidence that such deception occurred on or after September 10, 2001. Indeed, although in its Local Rule 56(a)2 Statement it declares that Hartford's decision to abandon the long-term care initiative prior to October 24, 2001, was "[u]nbeknownst to IISC," *see* Plf.'s Stat. of Disputed Issues of Material Fact at ¶ 17, this statement is not supported by the evidence cited there. IISC cites the deposition of Samuel H. Fleet, the President of NEBCO who was interested in a joint venture between IISC and NEBCO to market the IISC–Hartford product, *see id.* at ¶ 17, Ex. EE, Fleet Dep. at 167; however, his testimony indicates an awareness by the summer of 2001 that Hartford may have been looking for an exit strategy. *See id.* (stating, in response to how, in his mind, the June

2001 meeting concluded: "They were exiting the business. That is what I assumed was going to happen as soon as they left the building"). Because this evidence[4] indicates an awareness of Hartford's intention to abandon the long-term care initiative prior to September 10, 2001, when the statute of limitations on IISC's CUTPA claim began to accrue, and because none of the other evidence supports the "unbeknownst to IISC" portion of this paragraph, IISC's CUTPA claim must fail.[5]

## D. Punitive Damages under Counts II and III

The defendants challenge plaintiff's punitive damages claim in Counts II and III. Regarding the breach of good faith and fair dealing claim, Hartford argues that punitive damages are not available for this claim in relation to a commercial contract.

Punitive damages are not ordinarily recoverable for breach of contract .... [because] punitive or exemplary damages are assessed by way of punishment, and the motivating basis does not usually arise as a result of the ordinary private contract relationship. The few classes of cases in which such damages have been allowed contain elements which bring them within the field of tort. It is, of course, settled law that, in certain cases of tort, punitive or exemplary damages may properly be awarded.

*Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 127, 222 A.2d 220 (Conn. 1966). One Connecticut case where punitive damages for breach of contract were

upheld involved a "breach of contract founded on tortious contract [which] may allow the award of contract damages." *Barry v. Posi–Seal Int'l, Inc.*, 40 Conn. App. 577, 672 A.2d 514, 519 (1996) (citing *L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.*, 9 Conn.App. 30, 514 A.2d 766 (1986) (involving recovery of punitive damages for breach of an insurance contract)). In Barry, the court refused to permit punitive damages for breach of an employment contract, distinguishing the role of an employer from "the role of a 'quasi-public' insurance company with respect to the customer to whom it sells protection from harm." 672 A.2d at 520. The court based its rejection of punitive damages in part on its comparison to ordinary commercial contracts:

[Unlike insurers who sell protection], the financial security sought by an employee from the employer is not so very different from the financial security sought by one who enters into an ordinary commercial contract. Just as breach of an employment contract can have financial significance for an employee, so, too, breach of an ordinary commercial contract can have vital financial significance to the owner of a business that is dependent on a supplier's goods. We acknowledge that the owner of a business is in a better position than is an employee to bargain each term of the contract, but we cannot say that the difference is so significant that punitive damages should be available as compensation for the breach of one agreement and not for breach of the other.

*Id.* Because this case involves "an ordinary commercial contract," and since the court

---

**4.** IISC also cites a letter from Hartford's Tom Doran to Mr. Rosenthal, dated September 5, 2001, that stated that employees working on state approvals of the Policy had been "redirected ... to assist in the evaluation of our LTC portfolio." *See id.* at Ex. II.

**5.** Additionally, other allegations of deception appear to have occurred prior to the September 10, 2001, accrual date. *See id.* at ¶ 17; *see also* Def.'s Mem. in Supp. at 28–29. 12

has decided that a claim for breach of the covenant of good faith and fair dealing sounds in contract, the court will refuse to permit punitive damages for this claim.

### E. Negligent Misrepresentation (Count IV)

At oral argument, IISC stated that it is withdrawing its negligent misrepresentation claim against Hartford. Thus, the court rules that this claim is withdrawn with prejudice.

### F. Damages (Counts I–III)

■ Hartford devotes sixteen pages of its Memorandum in Support of Summary Judgment to argue that IISC's claim for damages must fail because IISC cannot satisfy the requisite elements of reasonable certainty, foreseeability, and causation.

■ "In order to recover lost profits, ... the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." *Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998). While damages "often are not susceptible of exact pecuniary computation and must be left largely to the sound judgment of the trier ... the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." *24 Leggett Street Ltd. Partnership v. Beacon Industries, Inc.*, 239 Conn. 284, 309, 685 A.2d 305 (1996) (citations omitted). Lost profits are recoverable if reasonably foreseeable and directly and proximately caused by any breach. *See West Haven Sound Development Corp. v. West Haven*, 201 Conn. 305, 319–20, 514 A.2d 734 (1986) (stating that "[u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach")

Hartford challenges IISC's damage claim, which is in excess of $100 million and is based on IISC's allegation that, "but for Hartford's conduct, [it] would have solicited by direct mail some 50 million association and affinity group members over the course of the Agreement with Hartford." *See* Plf.'s Mem. in Opp. at 12. Hartford argues that this damage claim is based on "pure speculation," was "entirely outside the realm of possibility as contemplated by the parties at the time that they entered into the Agreement," and fails to establish causation. *See* Def.'s Mem. in Supp. at 13–14, 18–20, 21–22. To support its damage claim, IISC has provided the reports of several experts. *See* Def.'s Stat. at Ex. 14, Plaintiff's Disclosure of Experts.

■ "[A] defendant may prevail on a motion for summary judgment where the plaintiff fails to provide evidence of damages, especially where damages are an essential element of a cause of action, such as breach of contract." *Maier–Schule GMC, Inc. v. General Motors Corp. (GMC Truck and Bus Group)*, 154 F.R.D. 47, 56 (W.D.N.Y.1994). Courts have denied summary judgment on the issue of liability while at the same time granting summary judgment on the issue of damages. *See id.* (citing *Strike It Rich, Inc. v. Schlitz Brewing Co.*, 505 F.Supp. 89 (D.D.C.1980)).

Nevertheless, the court will not grant summary judgment on IISC's damage claim in the present case. IISC has presented expert testimony, and thus the cases cited by the defendants are factually distinct. *See* Def.'s Mem. in Supp. at 10–11. *Maier–Schule GMC*, 154 F.R.D. at 54, involved a plaintiff who presented no more than a self-serving affidavit from its president to counter defendant's damages challenge. Similarly, in *Draft–Line Corp. v. Hon Co.*, 781 F.Supp. 841, 846 (D.P.R.

1991), the court granted summary judgment on the damages claim because plaintiff had "produce[d] absolutely no evidence in its opposition to defendant's motion for summary judgment to support its claim for damages," other than the allegations contained in its complaint. And finally, in *Zirin Labs. Int'l, Inc. v. Mead–Johnson & Co.*, 208 F.Supp. 633, 636 (E.D.Mich.1962), the court granted summary judgment on the damages claim because plaintiff's president testified at his deposition that the basis for his four million dollars damage estimate was "nothing more than [his] feeling."

Unlike these cases cited by the defendant, IISC has presented expert reports in support of its damages claim. Hartford challenges the 50 million solicitation volume assumption utilized by IISC's experts, claiming that it was given to them by Howard Rosenthal and that there was no reasonable basis for it. Indeed, one of IISC's expert, Vincent Bodnar, admitted that the "primary person" who gave the solicitation volume assumption was Mr. Rosenthal, *see* Def.'s Stat. at Ex. 10, Bodnar Dep. at 86, and his report also states that this assumption was "developed by IISC and its retained experts," *see id.* at Ex. 14A, Bodnar's Report at 7. Although the court agrees that relying on Rosenthal's unsupported assumption may be an insufficient basis for an expert's analysis, IISC has presented the report of another expert, Ronald Wobbeking, who participated in preparing Bodnar's model by reviewing the assumptions used in the model. Regarding the 50 million figure, Wobbeking reviewed IISC's Initial Marketing List, which listed various associations and TPAs and was purportedly "prepared from the Request for Proposal Log of quotes authorized and maintained by Hartford and the associations represented by New England Benefits Company (NEBCO)." *Id.* at Ex. 14D, Wobbeking's Report at ¶ 6. Wob-

beking's report states that the Initial Marketing List reflects the number of members in each association, which adds up to a total of more than 83 million members. *Id.* Wobbeking, confirming testimony from TPA representatives, *see, e.g.*, Plf.'s Stat. at Ex. G, Falcon Dep. at 62 (stating that "the offer to bring a new product to a member is . . . rubber stamped"), found it "acceptable" that the TPAs and associations would have been very receptive to offering a long-term care product to their members. He thus concluded that he was "reasonably certain that not less than 50 million association members could and would have been solicited by mail over the term of IISC's contract with Hartford." Def.'s Stat. at Ex. 14D, Wobbeking's Report at ¶ 6.

The court finds that this evidence provides some basis for the 50 million solicitation volume assumption such that it cannot say that IISC's damages claim is purely speculative. Moreover, considering that this is a summary judgment motion in which the burden of the non-moving party is only to present evidence that creates a genuine issue of material fact, the court need not determine whether the expert reports are correct. Since damages "must be left largely to the sound judgment of the trier," 24 *Leggett Street*, 239 Conn. at 309, 685 A.2d 305 (1996), the court concludes on the record before it that Hartford is not entitled to summary judgment on IISC's damages claim.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment [**Doc. No. 74**] is DENIED as to the breach of contract, covenant of good faith and fair dealing, and damages claims. Defendants' Motion for Summary Judgment is GRANTED as to the CUTPA claim and punitive damages on the covenant of good

faith and fair dealing claim. The negligent misrepresentation claim is dismissed with prejudice. Additionally, because the court's analysis above did not rely on any evidence that is the subject of Hartford's Motion to Strike [**Doc. No. 81**], the court will DENY the Motion to Strike as moot.

**SO ORDERED.**